2006 WY 121

**Richard T. SCHIRBER, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 05–104.**

Supreme Court of Wyoming.

Sept. 27, 2006.

Representing Appellant: Harry G. Bondi, Casper, Wyoming.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Matthew D. Obrecht, Student Intern. Argument by Mr. Obrecht.

Before VOIGT, C.J., and GOLDEN, HILL,* KITE, and BURKE, JJ.

* Chief Justice at time of oral argument

GOLDEN, Justice.

[¶ 1] Richard T. Schirber appeals from his conviction and sentence on one count of possession of a controlled substance in violation of Wyo. Stat. Ann. § 35–7–1031(c)(iii) and two counts of concealing stolen property in violation of Wyo. Stat. Ann. § 6–3–403(a)(i). Schirber claims the search warrant at issue was fatally flawed because the affidavit upon which it was based was insufficient to establish probable cause, and also that the search conducted incident to that warrant exceeded the scope of the warrant. Finding no error, we affirm.

## ISSUES

[¶ 2] Schirber presents the following two issues on appeal:

I. Does the affidavit in support of the application for search warrant establish that it is probable that quantities of controlled substances, records of drug transactions, or proceeds from drug transactions, will be found at Appellant's residence on February 5, 2004? Does the information supplied by the informants supply a sound basis of knowledge of criminal activity, or is the sparse reference to criminal activity outdated and stale?

II. Was the execution of the search warrant at Appellant's residence overly broad and did execution exceed the scope and authority requested or granted when officers searched serial numbers of over two hundred property items including two portable radios?

## FACTS

[¶ 3] On February 5, 2004, following an investigation into Schirber's involvement in the distribution of controlled substances in Thermopolis, Wyoming, Officer Mark Nelson of the Thermopolis Police Department obtained a warrant to search Schirber's residence. During the execution of the search warrant, law enforcement discovered Oxycontin (Oxycodone) tablets. The search also revealed several expensive hand-held radios. Officer Nelson removed the battery packs of

the radios, where he believed drugs could be hidden. The serial numbers of the radios were exposed upon removal of the batteries. Officer Nelson recorded the serial numbers. Officer Nelson later ascertained that the radios belonged to Schirber's former employer. A new warrant was issued on March 2, 2004, authorizing the search of Schirber's residence and the seizure of the stolen radios and any other stolen property found therein. The search was conducted on March 4, 2004, resulting in the seizure of the stolen radios, along with other items belonging to Schirber's former employer.

[¶ 4] Schirber was charged with, among other things, concealing stolen property and possession of a controlled substance. Before trial, Schirber filed two motions to suppress the evidence discovered during the searches of his residence. The first motion was based on an allegation that law enforcement exceeded the scope of the February 5 warrant by removing the radios' battery packs and recording the serial numbers. In the second suppression motion, Schirber challenged the sufficiency of the affidavit supporting the issuance of the February 5 search warrant. The district court denied both motions. Schirber was ultimately convicted of one count of possession of a controlled substance, in violation of Wyo. Stat. Ann. § 35-7-1031(c)(iii) (LexisNexis 2005), and two counts of concealing stolen property, in violation of Wyo. Stat. Ann. § 6-3-403(a)(i) (LexisNexis 2005). This appeal followed.

## DISCUSSION

### *Issuance of the February 5 Search Warrant*

#### *Standard of Review*

■■■ [¶ 5] In reviewing an affidavit in support of an application for a search warrant, this Court is mindful of the fact that there is a strong preference under the law for law enforcement officers to obtain a warrant instead of engaging in a warrantless search. *Cordova v. State*, 2001 WY 96, ¶ 11, 33 P.3d 142, 148 (Wyo.2001). Thus, an affidavit comes to this Court with a presumption of validity. *TJS v. State*, 2005 WY 68, ¶ 10, 113 P.3d 1054, 1057 (Wyo.2005). In order to

promote the warrant process, and remembering that affidavits are not normally executed by legal technicians, this Court resolves doubtful or marginal cases in this area in favor of sustaining the warrant. *TJS*, ¶ 10, 113 P.3d at 1057; *Cordova*, ¶ 11, 33 P.3d at 148; *Hixson v. State*, 2001 WY 99, ¶ 6, 33 P.3d 154, 156–57 (Wyo.2001). Ultimately, our duty on review simply is to ensure that the warrant-issuing judicial officer had a substantial basis for concluding probable cause existed. *Massachusetts v. Upton*, 466 U.S. 727, 728 732–33, 104 S.Ct. 2085, 2088, 80 L.Ed.2d 721 (1984) (per curiam).

#### *Analysis*

■■■ [¶ 6] On appeal, Schirber earnestly maintains that the affidavit executed and submitted by Officer Nelson, which is comprised primarily of statements from cooperating witnesses (CWs), fails to contain sufficient information to support a finding by a neutral magistrate of probable cause, a necessary precursor to the issuance of a warrant under both Article 1, Section 4 of the Wyoming Constitution and the Fourth Amendment of the United States Constitution. The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. *TJS*, ¶ 10, 113 P.3d at 1057; *Davis v. State*, 859 P.2d 89, 94 (Wyo.1993); *Ostrowski v. State*, 665 P.2d 471, 478 (Wyo.1983); *Smith v. State*, 557 P.2d 130, 133 (Wyo.1976). Probable cause

> is a "practical, nontechnical conception." *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949). "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.*, at 175, 69 S.Ct. at 1310.
> * * * *
> [P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.

*Illinois v. Gates,* 462 U.S. 213, 231–32, 103 S.Ct. 2317, 2328–29, 76 L.Ed.2d 527 (1983); *see Guerra v. State,* 897 P.2d 447, 453–54, 456 (Wyo.1995).

[¶ 7] When reviewing affidavits for probable cause, this Court continues to adhere to the standard espoused by the United States Supreme Court:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Gates,* 462 U.S. at 238, 103 S.Ct. at 2332; *see also TJS,* ¶¶ 12–13, 113 P.3d at 1057–58; *Cordova,* ¶ 15, 33 P.3d at 149; *Hixson,* ¶ 11, 33 P.3d at 159; *Hyde v. State,* 769 P.2d 376, 380 (Wyo.1989); *Bonsness v. State,* 672 P.2d 1291, 1293 (Wyo.1983). An affidavit must contain sufficient information within its four corners to allow the issuing judicial officer to make an independent determination that probable cause exists. Some underlying factual information, as opposed to mere suspicions or conclusory statements, must be supplied.

[¶ 8] Many factors may be relevant to a determination of the veracity and the basis of knowledge of an informant. A non-exhaustive lists includes: whether the informant has previously given reliable information to law enforcement; whether the statements of the informant are against the informant's penal interests; whether the informant acquired knowledge of the events through firsthand observation; whether the amount of detail provided is sufficient to make the statement self-verifying; the interval between the date of the events and the law enforcement officer's application for a warrant; and the extent to which law enforcement officers have corroborated the informant's statements. Also relevant is whether the law enforcement affiant included a professional assessment of the proba-ble significance of the facts related by the informant, based on experience or expertise. *See Gates,* 462 U.S. at 233–34, 103 S.Ct. at 2329–30; *United States v. Harris,* 403 U.S. 573, 584–85, 91 S.Ct. 2075, 2082, 29 L.Ed.2d 723 (1971); *United States v. Mykytiuk,* 402 F.3d 773, 776–77 (7th Cir. 2005); *United States v. Zayas–Diaz,* 95 F.3d 105, 111 (1st Cir.1996). No one factor is dispositive in the credibility analysis, and a deficiency in one may be compensated by a strong showing of another. *Id.*

[¶ 9] With this analytical framework in mind, we turn to Schirber's complaint that the affidavit supporting the February 5 search warrant is insufficient to support a finding of probable cause. The affidavit reads: [1]

### AFFIDAVIT OF MARK NELSON

THE UNDERSIGNED, Mark Nelson, being of lawful age, and being first duly sworn upon his oath, deposes and says:

1. That I am a certified Wyoming Law Enforcement Officer employed by the Town of Thermopolis, Wyoming as a Police Officer.

2. That I have reason to believe that at 640 Fremont, Thermopolis, Hot Springs County, Wyoming, * * * owned by William J. Bruckner and Billie Lou Bruckner and currently occupied by Richard "Rick" Schirber there is being concealed certain property, to-wit: controlled substances, illegal drugs, or evidence of use or transactions in illegal drugs and controlled substances, plus documentation, whether it be written, audio, video or visual pertaining to the use or transactions in controlled substances to include, but not limited to drug paraphernalia, package materials, containers, photographs, lock boxes and/or other secured items used to store controlled substances and/or any other evidence of illegal transactions in controlled substances, which

[ ] is stolen or embezzled in violation of law;

---

1. We've chosen not to expressly identify numerous immaterial typographical errors in the affi-davit.

[X] is designed or intended for use, or which is or has been used as the means of committing a criminal offense;

[X] is possessed, controlled, designed, or intended for use, or which is or has been used in violation of any law;

[X] tends to show a crime has been committed;

[X] tends to show that a particular person has committed a crime.

3. The facts tending to establish the foregoing grounds for issuance of a search warrant are as follows:

**Chad Harris**

On January 19, 2004 I interviewed Chad Harris in my office in the Hot Springs County Joint Law Enforcement Center. Chad Harris discussed his drug involvement when he lived in Thermopolis and his knowledge regarding drug use by other people he knew and information about those he would buy drugs from. Chad Harris has been living in Casper the past few months and has tried to stay away from those he dealt with here.

When Chad Harris lived in Thermopolis, he lived on the corner of 3rd and Clark, next door to LeRoy Barton. Chad Harris said that a number of times he purchased marijuana from LeRoy Barton. Chad Harris also bought Methamphetamine from Johnny Barton. Chad Harris also said that he had used methamphetamine, marijuana, and cocaine with Johnny Barton and LeRoy Barton.

Chad Harris discussed people he had used drugs with when he lived in Thermopolis. Chad Harris said that he had been using with Chad Severance. Chad Harris stated that on one occasion he and Chad Severance had driven over and parked at Big Horn Enterprises located at 641 Warren in Thermopolis. Chad Harris gave Chad Severance $50 to $60. Chad Severance got out of the vehicle and walked over to Rick Schirber's home located at 640 Fremont. That Chad Severance came back a few minutes later with a half gram of Methamphetamine and no money. Chad Harris was told by Chad Severance that the methamphetamine was from Rick Schirber. Chad Harris said that Rick Schirber would only sell to a small group of people and he, Chad Harris, had to go through Chad Severance to get methamphetamine from Rick Schirber. Chad Harris talked about Rick Schirber hanging out with Lara Halbert, Malcolm McCallum, Steve and Stephanie Robins [sic] and Shannon Ireland.

Chad Harris stated that on one occasion last summer at about 1:00 am he was coming back from a rig job with Steve Robins [sic]. That they stopped at Boysen Reservoir by Tough Creek and met Rick Schirber. Rick Schirber showed them a rock of methamphetamine that Chad Harris described as being bigger than a baseball.

Chad Harris said that Mike Nilsen showed up at his place in Casper about 2 weeks ago and said that he, Mike Nilsen, was hiding from the police in Hot Springs County. Mike Nilsen stated he was wanted for stealing a gun from a red pickup that was towed by him. Chad Harris told Mike Nilsen that the police knew Chad Harris' address in Casper and Mike Nilsen got worried and packed up and left to go to Cheyenne. Chad Harris did not see the gun but the way that Mike Nilsen talked about it he was sure that Mike Nilsen had the gun. I talked to Thermopolis Police officer Alan S. Nelson regarding a report of a stolen handgun and possible interview of Mike Nilsen. I also reviewed Officer Alan S. Nelson's incident report regarding a stolen handgun. From my conversation with Officer Alan S. Nelson and reviewing his incident report I learned that on December 30, 2003 Timothy Vankirk reported a Ruger 9MM semi-auto pistol was missing from his 1994 Chevrolet pickup. The pickup had been towed by Auto and RV Specialities and left parked in their lot overnight. Officer Alan S. Nelson had interviewed Mike Nilsen, at the time employed by Auto and RV Specialities, and had learned that Mike Nilsen was the person who had towed the vehicle and placed it in Auto and RV Specialties lot. Mike Nilsen admitted to being in the front of the vehicle to adjust the steering wheel

and lock it prior to the tow but denied seeing any weapons.

**Jodi Barton**

On February 2, 2004 Jodi Barton came into the Joint Law Enforcement Center and asked to speak to me. Jodi Barton talked about being involved with drugs while in Thermopolis. Jodi Barton stated that she and her husband Johnny Barton had moved to New Mexico to get away from the drugs. Jodi Barton admitted that while in Thermopolis she used illegal drugs. Jodi Barton stated that the last time she had used illegal drugs was new years eve [sic]. After that she learned she was pregnant and quit using drugs. Jodi Barton stated that she and her husband Johnny Barton have a little girl that is 3 years old and that she is expecting another child. Jodi Barton stated that her husband Johnny Barton is doing more drugs then [sic] ever and that she had moved back to Thermopolis to get away from her husband Johnny Barton.

During the interview Jodi Barton talked about Mike and Monic Nilsen. Jodi Barton stated that when she was in Casper at Chad Harris' home, Mike and Monic Nilsen were there also. Jodi Barton stated that Mike Nilsen talked about a gun that was stolen from a red truck that had been towed by Mike Nilsen. Jodi Barton stated that Mike Nielsen [sic] had stated that he had stolen the gun. Jodi Barton stated that when Mike and Monic Nilsen were getting ready to leave Casper Jodi Barton saw Mike Nilsen put a handgun under the drivers [sic] seat of the car he was driving.

**Lahoma Martin**

I have talked to Hot Springs County Sheriff's Department Lieutenant Dan Pebbles regarding an interview of Lahoma Martin. I have also reviewed Lieutenant Pebbles' report pertaining to the interview of Lahoma Martin. From my conversation with Lieutenant Pebbles and review of his report I learned that he interviewed Lahoma Martin on January 28, 2004 at approximately 1800 hrs at the Natrona County Detention Center in Casper, Wyoming.

Lieutenant Pebbles asked Lahoma Martin to tell him about an incident that oc-curred in 2002 at 242 Clark, which at the time was Lahoma Martin's residence. I am aware that Lahoma Martin had been arrested and charged with Delivery of a Controlled Substance, and was found not guilty at trial. Lahoma Martin told Lieutenant Pebbles that in March of 2002, a subject by the name of Bart Orndoff came to her residence at 242 Clark Street and requested that she sell him a ¼ ounce of marijuana. Lahoma Martin said she then went next door ·to Leroy and Kathy Barton's residence where she made contact with Kathy Barton and requested that Kathy Barton provide her with a ¼ ounce of marijuana. Lahoma Martin stated that Kathy Barton then produced a ¼ ounce of marijuana and Lahoma Martin gave Kathy Barton the money that had been given to Lahoma Martin by Bart Orndoff. Lahoma Martin then went back to her residence and gave the marijuana to Bart Orndoff. From my conversation with Lieutenant Pebbles I learned that at Lahoma Martin's trial that Bart Orndoff testified, under oath, that on the night in question he, Bart Orndoff, went to Lahoma Martin's residence to purchase marijuana. Bart Orndoff testified that another individual and ·not Lahoma Martin sold the marijuana to him. Bart Orndoff was subsequently charged with felony perjury and entered a plea of guilty. During his factual basis Bart Orndoff testified that he had testified falsely at Lahoma Martin's trial and that it had in fact been Lahoma Martin who sold the marijuana to him.

Lahoma Martin told Lieutenant Pebbles that the evening her residence was raided in March of 2002, earlier that evening Leroy Barton had shown her a pound of marijuana at his residence which was right next door to her residence. Lahoma Martin said that she smoked marijuana numerous times with Leroy & Kathy Barton and that she had use "crank" (methamphetamine) with Leroy Barton several times. Lahoma Martin told Lieutenant Pebbles that she smoked marijuana with Kathy Barton and has purchased marijuana from Kathy Barton at Kathy Barton's residence on several occasions while Lahoma Martin lived in Thermopolis.

Lahoma Martin informed Lieutenant Pebbles that on one occasion Cindy Reynolds purchased marijuana from the Barton's [sic] and then came next door to Lahoma Martin's residence and smoked the marijuana with Lahoma Martin.

Lahoma Martin informed Lieutenant Pebbles that the Barton's [sic] son, Johnny Barton, is a user of illegal drugs, he primarily injects methamphetamine. Lahoma Martin informed Lieutenant Pebbles that Johnny Barton would do a lot of running for his parents, Leroy & Kathy Barton, selling illegal drugs and making contacts for his parents to sell the illegal drugs they possessed.

Lahoma Martin informed Lieutenant Pebbles that she heard that Johnny Barton had moved to New Mexico and was living in a residence owned by Leroy & Kathy Barton. Lahoma Martin said that Johnny Barton's wife, Jodi Barton, is using "meth." Lahoma Martin said that Jodi Barton and Jodi and Johnny Barton's daughter were no longer with Johnny Barton and that Jodi Barton had left Johnny Barton.

Lahoma Martin informed Lieutenant Pebbles that Mike Nilsen is her brother-in-law. Lahoma Martin informed Lieutenant Pebbles that she heard and believed that Mike Nilsen was recently involved with the theft of a gun from a vehicle that he towed while working in Thermopolis. Lahoma Martin stated that Mike & Monic Nilsen showed up at her residence in Casper and that Mike Nilsen told her the cops were after him because they thought he stole a gun from a vehicle he had towed.

Lahoma Martin informed Lieutenant Pebbles that she does not know Rick Schirber personally but that she knows from dealings and association with others that Rick Schirber is a drug dealer in Thermopolis. Lahoma Martin informed Lieutenant Pebbles that she has heard Rick Schirber sells marijuana, methamphetamine and also deals in Oxycontin.

Lahoma Martin stated that Chad Severance has told her many times that he, Chad Severance, has bought methamphetamine from Rick Schirber. Lahoma Martin informed Lieutenant Pebbles that Chad Severance is a heavy user of methamphetamine and Chad Severance had told her he deals primarily with Rich [sic] Schirber. Lahoma Martin informed Lieutenant Pebbles that she has witnessed Chad Severance shooting methamphetamine while he lived with Lahoma Martin and her boyfriend, Chad Harris, for a short period during the summer of 2002. Lahoma Martin informed Lieutenant Pebbles that she knew of an incident where her boyfriend, Chad Harris, bought methamphetamine through Chad Severance who obtained the methamphetamine from Rick Schirber. Lahoma Martin informed Lieutenant Pebbles that both Chad Severance and Chad Harris told her that is where it came from.

Lahoma Martin informed Lieutenant Pebbles that Steve Robbins is also a heavy user of methamphetamine. Lahoma Martin informed Lieutenant Pebbles that she had been told by Steve Robbins that he buys his illegal drugs through Rick Schirber. Lahoma Martin informed Lieutenant Pebbles that she had witnessed Steve Robbins smoking methamphetamine while he was on a drilling location in the Hells Half Acre area. Lahoma Martin informed Lieutenant Pebbles that Steve Robbins' wife, Stephanie Robbins, is also a user of methamphetamine and that numerous marital problems have developed between Steve and Stephanie Robbins due to their illegal drugs usage. Lieutenant Pebbles informed me that during the late summer of 2003 he had been contacted by Shirley Allmaras, Stephanie Robbins' aunt. That Shirley Allmaras was greatly concerned about Stephanie Robbins due to Stephanie Robbins being involved in illegal drugs. Shirley Allmaras informed Lieutenant Pebbles that at that time Stephanie Robbins was seeing Rich [sic] Schirber while Stephanie Robbins was married to Steve Robbins. That Shirley Allmaras had expressed concern as Steve Robbins was volatile and possibly could hurt either Stephanie Robbins or Rick Schirber.

Lahoma Martin informed Lieutenant Pebbles that she was friends for awhile with Stormy Jeffres and that she had used marijuana and methamphetamine numer-

ous times with Stormy Jeffres. Lahoma Martin said that Stormy Jeffres had told her that she, Stormy Jeffres, received her illegal drugs through Rick Schirber. Lahoma Martin informed Lieutenant Pebbles that on one occasion she went to Stormy Jeffres' home and was not allowed in because Stormy Jeffres said that Rick Schirber was there.

### Jason Krueger

On Tuesday January 27, 2004 I contacted Jason Krueger in Hot Springs County Detention Center. Jason Krueger agreed to talk with me about his knowledge of drug activity in Thermopolis. Jason Krueger talked about his knowledge of drug activity and his own use of drugs. Jason Krueger said that he had been using marijuana since he was 14 and doing methamphetamine since he was around 18 years old. Jason Krueger said the methamphetamine was not a problem until this past year. The methamphetamine has gotten better or stronger. The new methamphetamine they call crystal, ice or glass. It is much stronger and really messed him up. Jason Krueger said he had been "banging" since about April. I asked what "banging" was and Jason Krueger said "banging" was injecting methamphetamine with a needle into a vein. Jason Krueger talked about how good he was getting at shooting up. Jason Krueger stated that Sharron "Sherry" L. Krueger, his wife, got him into shooting up. Jason Krueger stated that he and Sharron "Sherry" L. Krueger would be going somewhere and Sharron "Sherry" L. Krueger would ask if he could shoot up while driving or while in a public place. Jason Krueger stated that he could shoot up in the dark, in a moving car or other strange places. Jason Krueger stated that since April he had gotten more and more into the methamphetamine, was using up to a gram a day and had been doing nothing but drugs the past few months. Jason Krueger stated he had not been working and could not keep up with bills. Jason Krueger stated that he had been selling his property of value to buy more drugs. Jason Krueger stated he sold his Honda 1100, that he paid $8,000 for, to Delbert Bruckner for $3,500. Jason Krueger stated that he got $200 in cash and the rest in drugs.

Jason Krueger discussed who he had done drugs with. Jason Krueger listed his wife Sharron "Sherry" L. Krueger, Malcolm McCallum, Shannon Ireland, his ex-wife Sara Cheatham, Albert Cheatham, Sara Cheatham's husband, Rick Schirber, Chad Severance, Judy Cable, Maria Molina, Sam Grieve and Garret Lathina. Jason Krueger stated that he had seen Jeff Allen and Ryan Allen use methamphetamine. Jason Krueger stated that he also dealt with Roger and Lavita Kraushaar. Jason Krueger stated that Roger Kraushaar would shoot up with methamphetamine and Lavita Kraushaar would smoke methamphetamine. Jason Krueger stated that he and Sharron "Sherry" L. Krueger would trade ¼ gram of methamphetamine to Roger Kraushaar for "rigs" until he discovered he could buy his own needles and syringes from the drug store with out [sic] any questions. Jason Krueger stated that "rigs" were needles and syringes. Jason Krueger stated that Roger Kraushaar was also selling his, Roger Kraushaar's, prescription medication Oxycontin. Jason Krueger stated that Roger Kraushaar was working for R & S Well service [sic] and was trying to scam R & S Well Service and get a disability from them. I contacted Steve Shay, safety officer for R & S Well Service. Steve Shay confirmed that Roger Kraushaar had been injury [sic] while working for R & S Well Service and was on temporary disability.

Jason Krueger stated that he had been getting most of his drugs from out of town the past 8 months or so. Jason Krueger stated he would get a large amount and sell some of it to pay for his habit. Jason Krueger stated the last time he bought a small amount in town was from Rick Schirber and that may have been in April. Jason Krueger stated he and Sharron "Sherry" L. Krueger had been getting their methamphetamine from his ex-wife, Sara Cheatham, and her husband Albert Cheatham. Jason Krueger stated that Sara and Albert Cheatham live in Laramie. Jason Krueger stated that Sara and Albert

Cheatham had connections in Colorado to obtain methamphetamine. Jason Krueger stated that when he left town in November he went to Laramie and was staying with Sara and Albert Cheatham. Jason Krueger stated that when he left Laramie to return to Thermopolis he left his Suburban with Sara and Albert Cheatham so Sara and Albert Cheatham would have a good vehicle to use for his daughter. On February 2, 2003[sic] I learned that Jason Krueger's suburban [sic] was in Thermopolis and that Sara Cheatham was also in Thermopolis and staying at Sharron "Sherry" L. Krueger's home at 725 Broadway.

Jason Krueger stated that Sharron "Sherry" L. Krueger and Sara Cheatham would trade drugs back and forth. Jason Krueger stated that he and Sharron "Sherry" L. Krueger would make regular trips to Laramie to obtain more methamphetamine. Jason Krueger stated that he and Sharron "Sherry" L. Krueger would usually get one or two ounces a week depending on however much money he and Sharron "Sherry" L. Krueger had.

Jason Krueger talked about getting "shot up" by Shannon Ireland. Jason Krueger stated that he thought he was going to die from it. Jason Krueger stated that he had always mixed his own "loads" and that was the last time he had anyone else shoot him up. Jason Krueger stated that he remembers being on the floor thinking he was going to die and not being able to move or get up. Jason Krueger stated that his arm was numb for a day or two afterwards. Jason Krueger stated that after that time he made sure he always mixed his own and did his own "shooting up". Jason Krueger stated that Shannon Ireland was getting his methamphetamine from someone on the oil rigs and Shannon Ireland talked about the methamphetamine coming out of Utah. Shannon Ireland had been working rigs out of Wamsetter [sic] and is not always around.

Jason Krueger talked about Rick Schieber [sic] not working in over a year and his, Jason Krueger's, knowledge of Rick Schirber selling methamphetamine. Jason Krueger stated that Rick Schirber sells a lot of methamphetamine to Chad Severance and that Rick Schirber had sold methamphetamine to Jason Krueger. Jason Krueger stated that he had other sources and had been selling methamphetamine on his own and with Sharron "Sherry" L. Krueger, so he and Sharron "Sherry" L. Krueger did not need to buy much methamphetamine in town. Jason Krueger has purchased several grams from Rick Schirber, and said it was crank. Jason Krueger stated that Rick Schirber has lots of guns and usually carries in a shoulder holster. Jason Krueger stated that Rick Schirber has guns all over his house and is paranoid. Jason Krueger stated that Rick Schirber believes that people are out to get him and the police are after him. Jason Krueger stated that Rick Schirber obtained two baby monitors and placed them across from each other by the door. Jason Krueger stated that Rick Schirber believed that if anybody entered the house wearing a wire the baby monitors would pick up the electronic interference and make noise, alerting him to the wire.

Jason Krueger stated that Dean Willenbrecht was hanging out with Rick Schirber. Jason Krueger stated that Dean Willenbrecht was bringing methamphetamine, acid, and cocaine into town. Jason Krueger stated that Dean Willenbrecht also has a lot of guns and always has one with him. Jason Krueger stated that Dean Willenbrecht has a friend from Riverton that hangs out with Dean Willenbrecht. Jason Krueger stated that Dean Willenbrecht's friend was very strange and was trying to sell some handguns very cheap to Jason Krueger, before he, Jason Krueger left town. Jason Krueger stated that he thought that Dean Willenbrecht's friend was dangerous.

Jason Krueger stated that Rick Schirber is really into Oxycontin. Jason Krueger also discussed other people that were buying drugs from him and Sharron "Sherry" L. Krueger. Jason Krueger stated that a Rob and Melissa were regular methamphetamine and marijuana users. Jason Krueger stated that he did not know Rob's and Melissa's last name but did say that

Melissa worked at Heather Herring's daycare. Jason Krueger stated that Melissa Balstad also had been doing a lot of methamphetamine. Jason Krueger stated that Becky Harvey would also get methamphetamine for Sharron "Sherry" L. Krueger.

Jason Krueger also discussed Malcolm McCallum. Jason Krueger stated that he had seen a human skull in Malcolm McCallum's porch area. Jason Krueger stated that Malcolm McCallum had given the skull to Jason Krueger. Jason Krueger stated that Malcolm McCallum was concerned that the police might come back for the skull. Jason Krueger got the impression from Malcolm McCallum that the skull had come from a grave in Gebo. Jason Krueger stated that the skull was small as if from a child. Jason Krueger stated that the skull was at his house, 725 Broadway, on November 23, 2003. I have reviewed a report prepared by former Hot Springs County Deputy Sheriff Celia Easton. From review of Deputy Easton's report I learned that sometime during the latter part of April, 2002 there were six graves at the old town site of Gebo that had been disturbed. I learned that in two of the graves the coffins had actually been opened. One of the graves disturbed and the coffin opened was marked with a headstone that stated "Unknown Baby".

On February 3, 2004 Jason Krueger informed Thermopolis Police Chief that he had received a phone call in the detention center from Sara Cheatham. During the phone conversation Sara Cheatham informed Jason Krueger that Sharron "Sherry" L. Krueger was carrying a 9mm automatic pistol and that Sharron "Sherry" L. Krueger had other firearms in the house.

In interviews with law enforcement Jason Krueger has informed law enforcement that Rich [sic] Schirber owns a large number of firearms, including handguns. Jason Krueger also informed law enforcement that Rich [sic] Schirber carries a handgun in a shoulder holster. In my capacity as a law enforcement officer I have been to Rick Schirber's home and have seen both rifles and handguns. I have also taken reports from Rick Schirber

of stolen firearms and have returned recovered firearms to Rick Schirber.

As a result of the above information, Thermopolis Police Officers on regular patrol have been keeping record of the vehicles at 640 Fremont, the residence of Richard "Rick" Schirber. The following is a list of the dates and times vehicles were seen and the registered owners of those vehicles. *January 29, 2004*—Ryan Allen—7:15 a.m., Harold Willenbrecht—4:00 p.m.; *January 30, 2004*—Sharron "Sherry" Kruger [sic]—7:20 a.m., Judith Cable—9:05 a.m.; *February 3, 2004*—Chad Severance—3:00 p.m.

Based upon all of the information in this Affidavit, it is likely that Richard "Rick" Schirder [sic] or other associates of his may see law enforcement officers arrive. Much of the evidence may be disposed of easily by pouring down a drain or flushing down a toilet. Additionally Richard "Rick" Schirder [sic] is reported to be armed at all times and/or own numerous weapons. If the Defendant or his associates do see law enforcement arrive, it is likely that there will be an attempt to dispose of evidence or arm themselves with weapons before law enforcement begins knocking on his door. Therefore, it is extremely important that law enforcement officers be able to enter the premises being searched without knocking or identifying themselves prior to entering to serve the search warrant.

[¶ 10] Schirber contends that this affidavit is insufficient to support a finding of probable cause because it contains no current incriminating information. In other words, Schirber argues that the information is stale. Staleness

> varies greatly from case to case and is seldom amenable to precise measurement. Rather than being determined by the number of days or months between the facts relied upon and the issuance of the warrant, timeliness depends upon the nature of the criminal activity, the length of the activity, and the nature of the property to be seized.

*Guerra v. State,* 897 P.2d 447, 454 (Wyo.1995) (internal quotation marks omitted). Focus-

ing on the length of alleged criminal activity, Schirber argues on appeal that the affidavit contains only allegations of isolated drug sales, and a single possession of a large rock of methamphetamine, occurring many months before the issuance of the warrant, with no indication of ongoing criminal activity.

[¶ 11] Schirber supports his contention that the information in the affidavit is stale by employing a divide-and-conquer analysis. He cherry-picks selective portions of the information in the affidavit and addresses each in isolation. Schirber discounts entirely the statements of Jodi Barton and Lahoma Martin without analysis, simply declaring the information in their statements irrelevant because the majority of the information does not relate to him and the portions that arguably do relate lack adequate detail to be given any weight by the issuing judicial officer. Schirber also discounts the results of the law enforcement surveillance of his residence because no criminal activity was directly observed.

[¶ 12] Having summarily expunged the statements of Barton and Martin, Schirber focuses his appellate argument on limited portions of the statements provided by Chad Harris and Jason Krueger. In discussing the statement of Harris, Schirber restricts his attention to what he claims are the only two alleged incidents related by Harris that are potentially pertinent to the issue of probable cause. The first incident was Chad Severance's alleged buy of methamphetamine from Schirber. The other incident involved Schirber allegedly showing Harris a large rock of methamphetamine at Boysen Reservoir "on one occasion last summer." Schirber argues that these alleged incidents were isolated and occurred at least several months before the affidavit was submitted to the issuing judicial officer. As for Krueger, Schirber restricts his arguments to: Krueger's claim that he had "purchased several grams" of methamphetamine from Schirber, arguing that it lacks any corroborative details and time-frame; and Krueger's claim that "the last time he bought a small amount in town was from Rick Schirber and that may have been in April," arguing that it evidences only a single incident that occurred at least ten or eleven months before the affidavit was submitted to the issuing judicial officer.

[¶ 13] Schirber never analyzes his favored portions of the affidavit in the context of the affidavit as a whole. This piecemeal approach obviously is contrary to our established totality of the circumstances analysis, which requires the issuing judicial officer, as well as reviewing courts, to consider the information contained in an affidavit in its entirety. Eschewing Schirber's limited reading of the affidavit, this Court finds that the totality of the circumstances presented by the information in the affidavit is sufficient to support a finding that probable cause existed to believe Schirber was engaged in a continuing course of illegal drug activity.

[¶ 14] Initially we note that, despite Schirber's protestations, the isolated information in the affidavit supplied by Harris and Krueger with which Schirber takes issue is not irrelevant. This Court accepts that the temporal proximity of the alleged incidents is attenuated. The information, however, establishes that Schirber was known to have possessed and sold large amounts of methamphetamine. Chad Harris stated he saw Schirber with a baseball-size rock of methamphetamine and had made an indirect buy from Schirber "on one occasion." In the same vein, Jason Krueger talked about buying methamphetamine from Schirber in the past. While standing alone this information would not support a finding of probable cause in the instant case, the information gains significance when taken out of isolation and read properly in the context of the rest of the information in the affidavit.

[¶ 15] Looking at other information supplied by Krueger, Krueger clearly implicated Schirber in current, continuing illegal drug activity. Krueger stated that Schirber, as of the time of his statements to Officer Nelson, was a drug dealer in Thermopolis. Krueger identified individuals who buy drugs from Schirber. Krueger stated Schirber was hanging out with a man (Dean Willenbrecht) known by Krueger to be a supplier of various illegal drugs in the Thermopolis area.

[¶ 16] Lahoma Martin's statement, far from being irrelevant, also implicated Schirber in current, continuing illegal drug activity. Martin acknowledged she had never met Schirber. She also admitted, however, that she used illegal drugs and, through her dealings and associations with others, she knew Schirber was, as of the time of her statement, a drug dealer in Thermopolis. Martin also identified various individuals who had told her Schirber supplies them with illegal drugs.

[¶ 17] Law enforcement's surveillance of Schirber's residence circumstantially corroborated the information supplied by Krueger and Martin, bringing the information current. At various times shortly before the affidavit was submitted to the issuing judicial officer, law enforcement officers observed automobiles of drug dealers and users identified by Krueger and Martin parked in front of Schirber's residence.

[¶ 18] Schirber's continuing illegal drug activity can be best gleaned by piecing together information provided by Harris, Martin and Krueger regarding Chad Severance. Their consistent information regarding Severance provides a thread in the story that is easy to follow. Harris admitted that, when he lived in Thermopolis, he used methamphetamine with Severance. Harris described an incident in which he was with Severance and Severance walked over to Schirber's residence and returned a few minutes later with a half gram of methamphetamine. Severance stated to Harris he had bought it from Schirber. Martin stated, in the present tense, that Severance is a heavy user of methamphetamine and Severance had told her Schirber is his primary supply source. Krueger admitted to using methamphetamine with Severance and stated Severance buys a lot of methamphetamine from Schirber. Finally, Severance's vehicle was observed by law enforcement parked in front of Schirber's residence just a few days before the affidavit was executed and the warrant issued.

[¶ 19] This information, read as a whole and taken at face value, evidences a continuing course of illegal drug activity by Schirber. The next question then becomes whether the information, in whole or in part, is credible. On appeal, Schirber does not effectively challenge the veracity or basis of knowledge of the CWs regarding the information supplied by them. Independently, we find in the affidavit no internal inconsistencies or other circumstances that compel us to question the veracity of the CWs. All CWs gave statements against their penal interests. Various statements made by the CWs, whether about Schirber directly or collateral matters, corroborated each other.[2] We further find no reason to question the basis of knowledge of the CWs for their respective statements. We therefore accept, for appellate purposes, that the information provided by the CWs is reasonably trustworthy.

[¶ 20] The remaining issue, therefore, is whether the information supplied in the affidavit is adequate to support a finding of probable cause. The alleged short-comings of the affidavit are not hidden. For example, the affidavit does not contain specific time-frames where none are available. Lahoma Martin's admission that she had never met Schirber is expressly stated. The fact that law enforcement did not witness any criminal conduct during its surveillance of Schirber's residence is implicit from the omission of such a statement.[3] On the flip side, as already noted, the supplied information establishes a continuing course of illegal drug activity by Schirber. Further, the information implicating Schirber can fairly be said to come from two separate sources: Harris, Martin, and Barton; and Krueger.[4] Krueger

---

2. Jodi Barton's statement becomes significant specifically for her corroboration of collateral events related by Harris and Martin.

3. Schirber places heavy emphasis on other omissions of facts and circumstances he deems relevant to a determination of probable cause. There are, however, no rigid rules on the information required in an affidavit. No single factor is indispensable to a finding of probable cause.

Thus his argument regarding omissions is not well taken.

4. We link Harris, Martin and Barton together because Martin is Harris' girlfriend and they lived together in Thermopolis and in Casper. Jodi Barton is the daughter-in-law of Leroy and Kathy Barton, the next-door-neighbors of Harris and Martin when they lived in Thermopolis. The

is not identified by Harris, Martin or Barton as someone they did drugs with or knew had an association with Schirber. For his part, Krueger does not identify Harris, Martin or Barton as individuals he did drugs with or knew were associated with Schirber. Thus, their respective knowledge of Schirber's illegal drug activities appears to be independent. The credibility of their information is strengthened by the fact the drug users they identified included three people that overlapped—Chad Severance, Malcolm McCallum, and Shannon Ireland. In light of the above-analysis, we find that the affidavit contains sufficient reliable information to allow the issuing judicial officer to make a practical, common-sense determination that a fair probability existed that Schirber was engaged in a continuing course of criminal conduct involving possession and delivery of controlled substances and contraband or other evidence of the criminal conduct could be found in Schirber's residence.

### Propriety of recording of serial numbers

[¶ 21] Having determined that the search warrant was validly issued, we turn to Schirber's second issue.[5] Schirber argues Officer Nelson exceeded the scope of the February 5 warrant by writing down the serial numbers of the two hand-held radios. The district court disagreed and denied Schirber's motion to suppress. In reviewing a district court's ruling on a motion to suppress, this Court does not disturb findings on factual issues made by the district court unless they are clearly erroneous. The constitutionality of a particular search or seizure is a question of law that we review de novo. *Guzman v. State*, 2003 WY 118, ¶ 11, 76 P.3d

825, 827 (Wyo.2003); *Brown v. State*, 944 P.2d 1168, 1170–71 (Wyo.1997); *Guerra*, 897 P.2d at 452; *Wilson v. State*, 874 P.2d 215, 218 (Wyo.1994).

[¶ 22] On appeal, Schirber does not directly challenge the district court's ruling. Rather, Schirber's appellate argument begins from the presumptive premise that "[t]he State claims search and seizure of serial numbers from extensive personal property (including two portable radios) was proper under the plain view doctrine." Schirber's appellate argument then continues from this presumptive premise and is devoted entirely to disputing the applicability of the plain-view doctrine to the instant circumstances.[6]

[¶ 23] The plain-view doctrine is an exception to the warrant requirement, applicable only as a legal justification for a warrantless seizure.[7] The fatal flaw in Schirber's appellate argument as presented is that no seizure took place. The United States Supreme Court has made clear that the recording of serial numbers does not constitute a seizure under the Fourth Amendment. *Arizona v. Hicks*, 480 U.S. 321, 324–25, 107 S.Ct. 1149, 1152, 94 L.Ed.2d 347 (1987) (recording of serial numbers does not constitute a seizure because it has minimal effect on any possessory interest in the serial numbers or the items from which the serial numbers are taken). Put simply, merely copying information does not seize anything. Since there was no seizure, the plain-view doctrine has no applicability to this case.[8]

[¶ 24] The district court found that Officer Nelson was "looking for controlled substances which could easily be hidden in a cooler and/or a hand-held radio."[9] This fac-

---

knowledge of these three generally overlaps, with each providing slightly different details.

5. Since Schirber presents no independent argument under the Wyoming State Constitution, we limit our analysis to application of federal law.

6. Simply rebutting, in his opening brief, the argument he speculates the State will put forth in its responsive brief is an abdication of Schirber's responsibility as the appellant to frame and argue his issues to this Court.

7. The plain-view doctrine permits police to seize an object without a warrant if they are lawfully

in a position to view it, if its incriminating character is immediately apparent, and if they have a lawful right of access to it. *United States v. Thomas*, 372 F.3d 1173, 1178 (10th Cir.2004); *Vassar v. State*, 99 P.3d 987, 993 (Wyo.2004).

8. To the extent the district court referred to the recording of the serial numbers by Officer Nelson as a seizure, these references are legally incorrect.

9. In keeping with our standard of review, we accept this finding of fact by the district court, especially since this factual finding has not been challenged on appeal.

tual finding conclusively establishes that Officer Nelson's action in inspecting the radios and removing their battery packs was reasonable as incident to his search for controlled substances as authorized under the February 5 warrant. The serial numbers came into Officer Nelson's view upon removal of the battery packs and therefore the inspection thereof also fell within the scope of the February 5 warrant because it "produced no additional invasion of respondent's privacy interest." *Hicks,* 480 U.S. at 325, 107 S.Ct. at 1152. Schirber has shown no violation of his Fourth Amendment rights.

## CONCLUSION

[¶ 25] This Court finds that, when read in its entirety, the affidavit of Officer Nelson contains enough information to justify a finding of probable cause and thus the issuance of the search warrant. Further, the district court determined that Officer Nelson was within the authority granted to him by the February 5 warrant when he removed the battery packs of the radios. The ensuing inspection of the serial numbers therefore also was within the scope of the February 5 warrant. The district court did not err in denying Schirber's motions to suppress. Schirber's conviction and sentence is affirmed.

VOIGT, C.J., files a specially concurring opinion.

VOIGT, Chief Justice, specially concurring.

[¶ 26] I concur. I write separately for the reasons set forth in my concurring opinion in *Rohda v. State,* 2006 WY 120, ¶¶ 28–29, 142 P.3d 1155, 1169 (Wyo.2006).