BOOMGAARDEN, Justice.
[¶1] Paul D. Mathewson appeals his drug-related criminal convictions contending the district court erred by denying his motion to suppress evidence and his motion to dismiss for lack of a speedy trial. Mr. Mathewson also challenges his conviction for felony possession of a controlled substance, claiming the liquid contained in his water pipe (bong water), which tested positive for methamphetamine, does not constitute "a controlled substance in a liquid form" as contemplated *197 by Wyo. Stat. Ann. § 35-7-1031 (LexisNexis 2017). Finding no error, we affirm.
ISSUES
[¶2] Mr. Mathewson presents three issues, which we reorder and rephrase as follows:
1. Did the district court err when it denied Mr. Mathewson's motion to suppress evidence, which challenged the validity of the search warrant?
2. Was Mr. Mathewson denied his right to a speedy trial?
3. Does sufficient evidence support Mr. Mathewson's conviction of felony possession of methamphetamine in a liquid form as contemplated by Wyo. Stat. Ann. § 35-7-1031 ?
FACTS
[¶3] Law enforcement executed a no-knock search warrant on Mr. Mathewson's Thermopolis home on May 1, 2015. The officers suspected Mr. Mathewson of trafficking methamphetamine in Hot Springs County, Wyoming. Officers seized drugs and drug paraphernalia, including prescription pills, small quantities of marijuana and methamphetamine, syringes, and a water pipe filled with a colored liquid, which tested presumptive positive for methamphetamine. Officers arrested Mr. Mathewson on May 3, 2015. The State initially charged four counts: felony possession of methamphetamine, in violation of Wyo. Stat. Ann. § 35-7-1031(c)(ii) ; misdemeanor possession of methamphetamine, in violation of Wyo. Stat. Ann. § 35-7-1031(c)(i)(C) ; misdemeanor possession of methadone, in violation of Wyo. Stat. Ann. § 35-7-1031(c)(i)(D) ; and misdemeanor possession of marijuana, in violation of Wyo. Stat. Ann. § 35-7-1031(c)(i)(A).
[¶4] From the beginning, the court proceedings were often continued and rescheduled, due in large part to Mr. Mathewson's dissatisfaction with multiple, court-appointed counsel. Mr. Mathewson refused his first court-appointed attorney, the local public defender, and was reassigned an attorney from Park County. The circuit court attempted to timely hold the preliminary hearing, but Mr. Mathewson's attorney did not appear. The circuit court refused to go forward without Mr. Mathewson's attorney, and rescheduled the preliminary hearing after setting Mr. Mathewson's bail. He posted bond the next day. The State amended the information to include an additional count of felony delivery of methamphetamine, in violation of Wyo. Stat. Ann. § 35-7-1031(a)(i). Mr. Mathewson executed a waiver of speedy preliminary hearing and requested a further continuance of the preliminary hearing. The circuit court eventually held the preliminary hearing in June, after which it bound over the two felony charges to district court, while the misdemeanor charges remained in circuit court.
[¶5] The district court initially set Mr. Mathewson's arraignment for August 2015, but his attorney did not appear due to a scheduling conflict. The district court reset the matter and arraigned Mr. Mathewson on September 14, 2015. He pled not guilty and the district court scheduled a jury trial commencing February 1, 2016. The following month, Mr. Mathewson requested and received a new public defender.
[¶6] At the pretrial conference in January 2016, the district court informed the parties it vacated the trial date to accommodate another criminal matter. During the conference, the court acknowledged Mr. Mathewson's pro se motion to dismiss, filed the same day, alleging problems with his prior counsel, violations of his speedy preliminary hearing and speedy trial rights, and malicious prosecution.[1] In light of Mr. Mathewson's motion and his continued dissatisfaction with his appointed counsel, the district court left the pretrial conference open until it could be rescheduled along with a new trial date.[2]
[¶7] On the State's request, the district court reset trial for the end of February. Mr. Mathewson's counsel moved to continue this *198 setting to permit more time to file pretrial motions, subpoena witnesses, and designate exhibits. He also moved to consolidate all of Mr. Mathewson's pending felony and misdemeanor charges and filed speedy trial waivers in the district and circuit court cases.[3] The district court granted both motions and reset the jury trial for the end of May.
[¶8] The new trial date created a conflict for Mr. Mathewson's counsel, resulting in another request to continue the trial. The district court heard arguments on the motion in April 2016 and asked Mr. Mathewson directly whether he opposed the motion. Mr. Mathewson favored the motion and the court reset the trial for October 2016.
[¶9] A few months ahead of the October trial date, Mr. Mathewson's counsel filed a motion for substitution of counsel citing conflicts of interest and professional considerations. The district court held a hearing in August 2016 and granted the motion after receiving substitute counsel's assurances he could proceed to trial as scheduled. On August 4, 2016, Mr. Mathewson filed a demand for speedy trial and another pro se motion to dismiss, alleging ineffective assistance of counsel, speedy trial and discovery violations, and expressing his overall disagreement with the charges pursued by the State.
[¶10] Mr. Mathewson's counsel moved to suppress evidence a few weeks before trial, contending the search warrant was based on unreliable and uncorroborated information from confidential informants, and a neutral and detached magistrate did not issue it. His counsel also filed a pretrial memorandum and raised concerns about the timing for resolution of outstanding motions in advance of trial. Mr. Mathewson's counsel acknowledged the court's concern with another continuance in light of the speedy trial demand, but stated Mr. Mathewson recognized "that any and all continuances related to obtaining new counsel and filing of motions to suppress ... would not count toward his speedy trial date, and would waive any argument, now or in the future, that these continuances should be counted when calculating the speedy trial date." Mr. Mathewson disagreed with his attorney's statement regarding his calculation of the speedy trial deadline and filed a pro se "Supplement/Amendment of Pretrial Memorandum" stating his objection.
[¶11] Notwithstanding Mr. Mathewson's pro se speedy trial demand and the imminent trial date, Mr. Mathewson's counsel requested assignment of a new judge after discovering a potential conflict during trial preparation. The district court granted the motion, vacated all deadlines, including the trial date, and reassigned the case. After reassignment, the district court set a hearing in November 2016 to resolve all pending motions and reserved stacked trial dates in January and February in an effort to comply with the speedy trial demand.
[¶12] Near the end of November, Mr. Mathewson filed another pro se motion to dismiss, again asserting a speedy trial violation and claiming discovery violations. The same day, the court conducted a motions hearing, including the motion to suppress, the pro se motion to dismiss for a speedy trial violation, and other motions Mr. Mathewson filed pro se. After hearing the parties' arguments and receiving evidence pertaining to the suppression motion, the district court took all motions under advisement. A week later, the district court reset Mr. Mathewson's jury trial for January 23, 2017, sua sponte, due to an opening for a first stacked setting on its docket.
[¶13] In its written order, the district court denied Mr. Mathewson's motion to suppress, finding sufficient reliability and veracity to support the information provided by three of the confidential informants and further finding Mr. Mathewson failed to provide any evidence substantiating his claim that the issuing judge was biased and not impartial. The district court also struck Mr. Mathewson's pro se filings, sua sponte, including the *199 motion to dismiss on speedy trial grounds and the "Supplement/Amendment of Pretrial Memorandum."[4] As a result, Mr. Mathewson's counsel filed a motion to dismiss for lack of a speedy trial and moved to sever the trespassing and driving with a suspended license charges because they were unrelated to the pending drug charges. The district court denied both motions after a hearing, finding the delays in the case were attributable to the defense, Mr. Mathewson was not "substantially prejudiced" in getting his case tried, and the cases were previously consolidated at Mr. Mathewson's request.
[¶14] A week before trial, Mr. Mathewson filed a pro se motion for new counsel claiming his current attorney refused to make legal decisions insisted by Mr. Mathewson. As the jury gathered on the morning of trial, Mr. Mathewson informed the court he desired to retain private counsel, but had not yet done so. The district court denied the motion as untimely and proceeded with the trial as scheduled.
[¶15] At the close of the State's case, Mr. Mathewson's counsel moved for judgment of acquittal challenging the sufficiency of the evidence on all eight counts. The district court denied the motion, finding that although there may be issues of weight and credibility, the State presented sufficient evidence to submit the matter to the jury. After the court's ruling, Mr. Mathewson's counsel informed the court of the defense's decision not to call any witnesses. The jury ultimately found Mr. Mathewson guilty on six counts: (Count I) felony possession of methamphetamine; (Count III) misdemeanor possession of methamphetamine; (Count V) misdemeanor possession of marijuana; (Count VI) use of methamphetamine; (Count VII) trespassing; and, (Count VIII) driving with a suspended license. The jury acquitted Mr. Mathewson on (Count II) delivery of methamphetamine and (Count IV) possession of methadone.
[¶16] Mr. Mathewson's counsel filed a motion for judgment of acquittal solely challenging the sufficiency of the evidence for felony possession of methamphetamine. The district court summarily denied Mr. Mathewson's motion after a hearing, concluding the evidence provided a valid basis for Mathewson's felony methamphetamine possession conviction. Following sentencing, Mr. Mathewson moved to stay his sentences pending final disposition after an appeal.[5] The district court granted the stay, but continued Mr. Mathewson's original bond conditions. This appeal followed.
DISCUSSION
I. Did the district court err when it denied Mr. Mathewson's motion to suppress evidence, which challenged the validity of the search warrant?
[¶17] Mr. Mathewson claims the district court improperly denied his motion to suppress evidence, contending the affidavit in support of the no-knock search warrant lacked probable cause, "contained contradictory statements and outright lies by the informants," and was not issued by a neutral and detached magistrate. For these reasons, *200 Mr. Mathewson asserts the search warrant failed to comport with the state and federal constitutions and necessitates suppression of all the evidence obtained under the warrant.
A. Probable Cause
[¶18] We have long recognized the Wyoming Constitution is more protective than the Fourth Amendment to the United States Constitution in that it requires that "probable cause be supported by affidavit rather than the more general 'oath or affirmation' of the Fourth Amendment ...." Cordova v. State , 2001 WY 96, ¶ 8, 33 P.3d 142, 147 (Wyo. 2001), abrogated on other grounds by TJS v. State , 2005 WY 68, ¶ 8, 113 P.3d 1054, 1056 (Wyo. 2005) (citation omitted). The issue in this case, however, is not whether probable cause was established by affidavit, as there is no dispute that the warrant to search Mr. Mathewson's home was issued in accordance with the affidavit requirement in Article 1, § 4 of the Wyoming Constitution. The substantive issue in this case is whether the affidavit contained sufficient information of the type necessary to establish probable cause. We will analyze Mr. Mathewson's probable cause claim applying federal constitutional principles because he failed to make any argument that the Article 1, § 4 of the Wyoming Constitution provides greater protection under a probable cause analysis than does the Fourth Amendment.[6] Sheesley v. State , 2019 WY 32, ¶¶ 15-16, 437 P.3d 830, 837 (Wyo. 2019) ("[l]itigants need not engage in a rigid, formulaic analysis to convince us to consider independent state constitutional grounds," however, failure to analyze any of the six non-exclusive Saldana criteria justifies our foregoing any independent state constitutional analysis). Mr. Mathewson's claim that the probable cause affidavit violates the Fourth Amendment is subject to de novo review. Guerra v. State , 897 P.2d 447, 453 (Wyo. 1995) ; see also TJS , ¶ 9, 113 P.3d at 1057 n.1 (Wyo. 2005).
[¶19] Lieutenant Pebbles of the Hot Springs County Sheriff's Office prepared the probable cause affidavit based on information received from four confidential informants and information known to law enforcement officers through prior investigations, inter alia . Mr. Mathewson asserts Lieutenant Pebbles relied solely on hearsay and double hearsay information from inherently untrustworthy confidential informants as a factual basis for his affidavit. Mr. Mathewson further asserts the affidavit lacked any corroboration of the confidential informants' statements or Lieutenant Pebbles' firsthand knowledge. He also claims the information in the affidavit was stale. The State responds that the affidavit established probable cause that Mr. Mathewson was committing drug-related crimes because the confidential informants provided recent and detailed factual information, much of which was independently corroborated by the Hot Springs County Sheriff's Department or another confidential informant.
[¶20] To issue a valid search warrant,[7] the judicial officer "must have a substantial basis for concluding that probable cause exists[,]" based on a two-fold finding: first, "the factual situation described in the affidavit is sufficient to cause a reasonably cautious or prudent person to believe that a crime was being committed or that one had been committed[;]" second, there must be an "adequate showing that the fruits of the crime or the evidence thereof" are in the place to be searched. TJS , ¶ 12, 113 P.3d at 1057 (citations omitted). The judicial officer does not measure the affidavit by a "reasonable doubt" or "preponderance of [the] evidence standard"; rather, the "circumstances set forth in the affidavit must amount to more than a mere suspicion yet need not rise to the level of prima facie evidence of guilt." Rohda , ¶ 6, 142 P.3d at 1159 (citation omitted).
*201 [¶21] When, as here, an affidavit contains an informant's hearsay statement, sufficient facts must be set forth for the judicial officer to independently judge "the third party's credibility, veracity, reliability and basis of knowledge" in deciding whether probable cause exists. TJS , ¶ 13, 113 P.3d at 1057-58 (citation omitted). The credibility of an informant's hearsay statement depends on several factors, including, but not limited to:
whether the informant has previously given reliable information to law enforcement; whether the statements of the informant are against the informant's penal interests; whether the informant acquired knowledge of the events through firsthand observation; whether the amount of detail provided is sufficient to make the statement self-verifying; the interval between the date of the events and the law enforcement officer's application for a warrant; and the extent to which law enforcement officers have corroborated the informant's statements. Also relevant is whether the law enforcement affiant included a professional assessment of the probable significance of the facts related by the informant, based on experience or expertise.
Schirber v. State , 2006 WY 121, ¶ 8, 142 P.3d 1169, 1173 (Wyo. 2006) (citations omitted). No single factor is dispositive, and a deficiency in one factor may be mitigated by a strong showing of another. Id. (citation omitted). For example, an informant's firsthand knowledge of the events or conduct he describes enhances his credibility, as do statements against penal interest. TJS , ¶ 17, 113 P.3d at 1060 (citations omitted); see Fosen v. State , 2017 WY 82, ¶ 14, 399 P.3d 613, 616-17 (Wyo. 2017) (citations omitted). Credibility is also enhanced by corroboration of facts supplied by the confidential informant. TJS , ¶ 19, 113 P.3d at 1060. "If an informant is right about some things, he is more likely right about other things." Id. (quoting Bonsness v. State , 672 P.2d 1291, 1293 (Wyo. 1983) ). However, "[i]t is not necessary that the affidavit reflect verification of all facts presented by the informant." Id. (citation omitted). We consider a confidential informant's information "self-verifying" if the informant describes the suspect's criminal activity "in such sufficient detail that the judicial officer reasonably may know that he is relying on information more substantial than a casual rumor or an accusation based merely on general reputation." Rohda , ¶ 8, 142 P.3d at 1160.
i. Sufficiency of Information from Confidential Informants
[¶22] Mr. Mathewson contends the affidavit lacked sufficient information for the judicial officer to make an independent decision concerning the confidential informants' credibility and veracity. He asserts the hearsay statements of confidential informants facing their own criminal charges, "are the epitome of bare conclusions," which were never corroborated or investigated by Lieutenant Pebbles and, thus, are not entitled to enhanced credibility. Mr. Mathewson particularly challenges the weight, if any, to give CI 15-4's statements, because, according to Mr. Mathewson, CI 15-4 is a "drug user turned informant for preferential treatment." Mr. Mathewson also argues that too much time passed between CI 15-4's statements to Lieutenant Pebbles and the issuance of the warrant. We disagree.
[¶23] The affidavit makes clear that Lieutenant Pebbles primarily relied on information provided by three confidential informants to establish probable cause. Two of the informants had not previously provided information to officers leading to arrests or convictions; thus, the judicial officer could not establish their veracity or reliability on that basis. See Rohda , ¶ 8, 142 P.3d at 1160 ("When the secondary source person is a confidential informant, the veracity or reliability requirement is usually met by the recitation in the affiant's affidavit by either the primary source affiant or the secondary source law enforcement officer of previous instances in which the law enforcement officer obtained information from the confidential informant that led to arrests or convictions."). However, both those informants provided statements against their penal interests, which is a recognized factor for establishing veracity or reliability. See id. Further, when the affidavit is considered as a whole, the confidential informants supplied sufficient "self-verifying" details for the judicial officer to independently determine *202 whether probable cause existed to issue the warrant, including whether the information was too stale to support the warrant. We summarize and analyze the contents of the affidavit as follows:
a. Confidential Informant 15-4
[¶24] Lieutenant Pebbles received information from CI 15-4 two days before the warrant issued, implicating Mr. Mathewson in the Thermopolis methamphetamine trade. CI 15-4's statements contained recent observations, included statements against his penal interest, and Lieutenant Pebbles corroborated some of his facts. For example, CI 15-4 told Lieutenant Pebbles he purchased one-half gram of methamphetamine for $ 75 from Mr. Mathewson on April 9, 2015, at Mr. Mathewson's home. He stated Mr. Mathewson "weighed out" the one-half gram from a larger quantity of about 13 to 14 grams of methamphetamine. CI 15-4 injected the methamphetamine the same day. This statement against CI 15-4's penal interest was corroborated by Lieutenant Pebbles because he knew CI 15-4 tested positive for methamphetamine on April 9, 2015. In addition, this statement shows CI 15-4's firsthand knowledge of criminal activity, adding further weight to his credibility. Bonsness , 672 P.2d at 1293 (citation omitted) (explaining that a detailed description of criminal activity along with a statement that the event was observed firsthand, entitles the informant's "tip" to carry greater weight than it might otherwise).
[¶25] CI 15-4 informed Lieutenant Pebbles he purchased methamphetamine from Mr. Mathewson almost daily at the Mathewson residence from January 1, 2015, until approximately March 1, 2015. He explained that Mr. Mathewson keeps some of his "stash" in a metal tea can in a drawer under the love seat in his living room, as well as hidden in the walls throughout the house, in his garage, and outbuildings. He explained he purchased methamphetamine from Mr. Mathewson for about a year before Mr. Mathewson ever revealed where he kept the drug, evidencing Mr. Mathewson's ongoing criminal activities. This level of detail describing Mr. Mathewson's conduct is self-verifying and sets forth CI 15-4's firsthand observations, further enhancing his credibility. See Rohda , ¶ 8, 142 P.3d at 1160.
[¶26] CI 15-4 also stated he knew other people who purchased methamphetamine from Mr. Mathewson and observed them doing so. He first identified Jackie Wurtz and stated he purchased methamphetamine from Ms. Wurtz, who obtained the methamphetamine directly from Mr. Mathewson. He then identified Phyllis Hugh, stating he would sometimes sell methamphetamine to Ms. Hugh and other times she would purchase it directly from Mr. Mathewson. CI 15-4 admitted to smoking methamphetamine with Mr. Mathewson, Ms. Wurtz, and Karl Wurtz at the Mathewson residence sometime in February 2015, and stated Mr. Mathewson kept the device used to smoke the drug, a clear glass "kronk," by his couch or in the drawer underneath the couch with the metal tea can. These statements are also against CI 15-4's penal interest, contain self-verifying details, and show his firsthand knowledge of criminal activity, adding weight to his credibility. Lieutenant Pebbles corroborated some of CI 15-4's information about Jackie Wurtz when he received information from two other confidential informants that they, too, purchased methamphetamine from Jackie Wurtz. And, Lieutenant Pebbles knew "from personal experience that Jackie Wurtz has been convicted of felony Possession of a Controlled Substance, Methamphetamine in Hot Springs County, Wyoming."
[¶27] CI 15-4 estimated Mr. Mathewson made between $ 1,000 and $ 2,000 per day selling methamphetamine and he acquired numerous vehicles and lived a comfortable life as a result. He provided a detailed description of the interior and exterior of Mr. Mathewson's home and surrounding property, including fencing, gates, and access to the house. Lieutenant Pebbles also knew from personal experience that Mr. Mathewson lived at the house described by CI 15-4, and there were numerous vehicles on the Mathewson property, including cars, trucks, buses, a motor home, and a camper.
[¶28] CI 15-4 described Mr. Mathewson's security and intercom system, stating he had cameras at the front and back doors, the *203 doors facing the street and the alley, and at the edge of the property facing toward the house. This information provided additional self-verifying details and support for issuance of a no-knock warrant, as discussed infra at ¶ 43. Lieutenant Pebbles knew Mr. Mathewson had a similar, sophisticated surveillance system at a previous home that Lieutenant Pebbles searched in 2009 and where Mr. Mathewson was found to possess controlled substances. At that time, Mr. Mathewson was able to see and hear law enforcement approaching, and because officers did not have a no-knock warrant, they suspected he flushed controlled substances down the toilet before officers eventually entered.
[¶29] CI 15-4 told Lieutenant Pebbles that Mr. Mathewson recently traded methamphetamine for a generator with an individual from the Town of Shoshoni. Lieutenant Pebbles confirmed with Fremont County law enforcement that generators had recently been reported stolen in that area. CI 15-4 then told Lieutenant Pebbles that Mr. Mathewson's son, Jordan, sold methamphetamine for his father, but the two were not currently getting along because Jordon was shorting customers and owed people a lot of money. This information was corroborated by a second informant, CI 15-1. Finally, CI 15-4 stated Mr. Mathewson obtained his methamphetamine supply from Salt Lake City, Utah, which CI 15-1 corroborated.
b. Confidential Informant 15-1
[¶30] CI 15-1's statements likewise contained direct and recent knowledge of criminal activity and included statements against his penal interest. Some of the information CI 15-1 provided was corroborated by Lieutenant Pebbles or CI 15-4. For example, CI 15-4 told officers he previously sold methamphetamine to CI 15-1 on multiple occasions, which CI 15-1 confirmed. CI 15-1 stated that all the methamphetamine being sold in Thermopolis was coming from Mr. Mathewson, who obtained his methamphetamine from Salt Lake City, Utah. CI 15-1 told officers Mr. Mathewson supplies multiple people with methamphetamine, who in turn sell to CI 15-1, including CI 15-4. CI 15-1 further stated that when purchasing methamphetamine from CI 15-4, he would go to CI 15-4's home to give him the money and CI 15-4 would obtain the methamphetamine from Mr. Mathewson's home. He explained CI 15-4 would either go alone or CI 15-1 would drop CI 15-4 off outside Mr. Mathewson's home and then drive around and later return to pick him up and receive the methamphetamine. The purchase price was usually $ 150 per gram and he would buy between 1-3 grams per purchase.
[¶31] CI 15-1 told officers he purchased a gram of methamphetamine from CI 15-4 around February 28, 2015, two months prior to the search of Mr. Mathewson's home. On that date, CI 15-1 dropped CI 15-4 off at the Mathewson residence, picked him up a short time later, and received the methamphetamine. CI 15-1 informed the officers where CI 15-4 hid methamphetamine in his house, which officers independently confirmed by searching CI 15-4's home in April 2015, thereby enhancing CI 15-1's credibility.
[¶32] CI 15-1 also purchased methamphetamine from Jennifer Smith, who he knew went to Mr. Mathewson's home to obtain the methamphetamine, and from Ms. Smith's girlfriend, Shannon Ireland. He accompanied Ms. Smith to Mr. Mathewson's home to pick up the methamphetamine. These are additional statements against CI 15-1's penal interest.
[¶33] Finally, CI 15-1 stated that Mr. Mathewson's son, Jordan, sells methamphetamine depending on whether he is getting along with Mr. Mathewson at the time, and has sold to CI 15-1. CI 15-1 stated Jordan will go to Mr. Mathewson's home to obtain the methamphetamine if he is not carrying it. Jordan also informed CI 15-1 that he was the person going into yards and stealing items such as gas and camping equipment, including chainsaws and camping equipment from Jake Yeoman's house. Jordan told CI 15-1 he stored the stolen property in Mr. Mathewson's bus and outbuildings. Lieutenant Pebbles knew through independent investigation that some of the properties CI 15-1 described had items such as gasoline, rakes, camping items, and a chainsaw stolen. CI 15-1's statements against penal interest, self-verifying details, and corroboration of some of the *204 information by law enforcement officers, lend further weight to CI 15-1's credibility. See, e.g. , Bonsness , 672 P.2d at 1293.
c. Confidential Informant 15-2
[¶34] CI 15-2 further corroborated CI 15-4's statements implicating Mr. Mathewson in the ongoing sale of illegal drugs. CI 15-2 is deemed reliable because he previously provided verified information to law enforcement officers. See, e.g. , Rohda , ¶ 8, 142 P.3d at 1160 (citation omitted). On this occasion, CI 15-2 told Lieutenant Pebbles that in March and April of 2015, he purchased methamphetamine from "Jackie." He did not know Jackie's last name, but stated that during a purchase on April 22, 2015, Jackie arrived in a blue Neon and CI 15-2 knew the car belonged to Karl from T-Town Auto. Lieutenant Pebbles independently knew that Jackie Wurtz's husband, Karl Wurtz, drove a 2005 blue Dodge Neon and was employed by T-Town Auto. In addition, CI 15-4 named Jackie Wurtz as a person who purchased methamphetamine from Mr. Mathewson. CI 15-2's identification of Jackie Wurtz as a methamphetamine dealer lent credibility to CI 15-4's information regarding Mr. Mathewson, even though CI 15-2 did not directly implicate Mr. Mathewson.[8]
[¶35] Having reviewed Lieutenant Pebbles' affidavit de novo, we are satisfied probable cause existed. The information provided by CI 15-4 and CI 15-1, as further supported by CI 15-2's statements, contained sufficiently recent and detailed factual information to establish probable cause, including the nexus between the alleged criminal activity and Mr. Mathewson's residence. Much of the information received from the confidential informants was independently corroborated by law enforcement or other confidential informants. Non-corroborated hearsay statements were supported by other acceptable indicia of reliability. Thus, the judicial officer reasonably knew he was relying on something more substantial than casual rumors or accusations based merely on general reputation, and properly considered the confidential informants' information as part of the totality of the circumstances showing probable cause. See, e.g. , Abeyta , ¶¶ 23-24, 167 P.3d at 9.
[¶36] We are not troubled by the amount of time between when CI 15-4 purchased methamphetamine from Mr. Mathewson and when law enforcement executed the search warrant. Mr. Mathewson's argument that the information in the affidavit was stale overlooks the many facts in the probable cause affidavit that described Mr. Mathewson's ongoing scheme to sell methamphetamine. See , e.g. , Cordova , ¶ 21, 33 P.3d at 150, abrogated on other grounds by TJS , 113 P.3d 1054 (citation omitted) ("Time and staleness assuredly are elements of probable cause. However, when an affidavit indicates the existence of an ongoing scheme to sell drugs, the passage of time becomes less significant than is the case of a single, isolated transaction."); see also Crackenberger v. State , 2006 WY 162, ¶ 14, 149 P.3d 465, 472 (Wyo. 2006) (citation omitted). The facts in the affidavit established that CI 15-4's purchase from Mr. Mathewson was not a single, isolated transaction. Because the facts in the affidavit related instead to verified, ongoing criminal activity involving Mr. Mathewson and his residence, probable cause existed to issue the search warrant. The district court therefore properly denied Mr. Mathewson's motion to suppress the evidence.
*205 B. False Information
[¶37] For the first time on appeal, Mr. Mathewson asserts the probable cause affidavit contains false information, contradictory statements, and outright lies, thereby creating an insufficient affidavit and warranting suppression of the evidence. Mr. Mathewson's suppression motion was premised on his claims that the affidavit lacked probable cause because the confidential informants' information was unreliable and uncorroborated, not because the confidential informants' statements were false. His arguments at the suppression hearing were limited to those same claims, and he made no effort pursuant to Franks v. Delaware , 438 U.S. 154, 171-72, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978) to prove that false statements were intentionally or recklessly included in the affidavit and that the alleged false statements were necessary to find probable cause. Consequently, Mr. Mathewson's "false information" argument is procedurally misplaced. Guerra , 897 P.2d at 457.
[¶38] Franks requires a defendant to "make a preliminary showing of intentional or reckless falsity, together with a demonstration that the affidavit is insufficient, absent the false statements ...." Guerra , 897 P.2d at 457. Once the preliminary showing is made, the defendant is entitled to a hearing where the burden is on the defendant to prove his claims by a preponderance of the evidence. Id. (citation omitted); see also Williams v. State , 655 P.2d 273, 277 (Wyo. 1982) ; Lefferdink v. State , 2011 WY 75, ¶ 9, 250 P.3d 173, 176 (Wyo. 2011). When this process is followed, we review the denial of a motion to suppress raising false information claims for an abuse of discretion. Davis v. State , 859 P.2d 89, 93 (Wyo. 1993).
[¶39] Mr. Mathewson's counsel stated in his pretrial memorandum that he believed a Franks hearing on the truthfulness of the affidavit would be necessary. However, Mr. Mathewson's motion to suppress did not raise a "false information" allegation, and he never otherwise filed a motion or made the preliminary showing that would have entitled him to a Franks hearing. The supplement to Mr. Mathewson's motion to suppress, filed after his pretrial memorandum and before the suppression hearing, made no reference to the necessity of a Franks hearing, whatsoever. Nor did Mr. Mathewson request a Franks hearing at the motion to suppress hearing. On appeal, he baldly asserts the suppression hearing was "effectively a suppression hearing and a [ Franks ] hearing wrapped up as one." The record refutes this assertion.
[¶40] Mr. Mathewson's failure to raise a "false information" argument and make the required preliminary showing prior to trial hampers our review because it is difficult to apply an abuse of discretion standard when the district court had no opportunity to decide the issue. See, e.g. , Broberg v. State , 2018 WY 113, ¶ 18, 428 P.3d 167, 172 (Wyo. 2018) (quoting Schreibvogel v. State , 2010 WY 45, ¶ 33, 228 P.3d 874, 885 (Wyo. 2010) ) ("[A]pplication of an abuse of discretion standard is difficult, if not impossible, in a situation where the issue is not brought to the attention of the district court for [a] ruling.") This problem alone would justify our refusal to further review Mr. Mathewson's "false information" claim.
[¶41] Significantly, however, our recent holding in Rodriguez v. State , 2019 WY 25, ¶ 37, 435 P.3d 399 (Wyo. 2019), precludes further appellate review of Mr. Mathewson's "false information" claim. In Rodriguez , we held that "the failure to file a W.R.Cr.P. 12(b)(3) -required motion bars appellate review of such claims, including suppression questions, unless the defendant shows good cause for failing to timely assert the claim." Id. It follows that where, as here, a pre-trial motion to suppress is filed, but the motion fails to assert an argument the defendant later raises for the first time on appeal, absent a showing of good cause, W.R.Cr.P. 12(g) bars appellate review of any evidence suppression arguments that could have been raised pre-trial but were not. Id. ; United States v. Burke , 633 F.3d 984, 988 (10th Cir. 2011) (explaining that the failure to present specific issues or arguments to suppress evidence to the district court are waived absent demonstrating good cause); see also , United States v. Shrader , 665 Fed.Appx. 642, 649 (10th Cir. 2016) ;
*206 United States v. Franco , 632 Fed.Appx. 961, 963 (10th Cir. 2015) ; United States v. Augustine , 742 F.3d 1258, 1266 (10th Cir. 2014). As in Rodriguez , the record here reveals no impediment to Mr. Mathewson's ability to have argued that the confidential informants' statements were not simply untrustworthy and stale, but false. Quite the contrary, this record establishes that Mr. Mathewson abandoned his initial pre-trial assertion that a Franks hearing would be necessary to establish falsity of the information. These circumstances defeat any argument that Mr. Mathewson had good cause for failing to raise his "false information" claim in his motion to suppress. This claim is therefore waived and barred from review.[9]
C. Neutral and Detached Magistrate
[¶42] Mr. Mathewson argues that evidence from the search of his home should have been suppressed because the judicial officer who issued the warrant was not neutral and detached, as the Fourth Amendment requires. He contends his 2007 complaint against the issuing officer, coupled with that judge's subsequent recusals from cases involving Mr. Mathewson (with the exception of signing the no-knock warrant) reveal a lack of neutrality. Mr. Mathewson further claims the judge improperly issued the warrant because he is not a district court judge or district court commissioner and he lacked the probable cause specifically required for a no-knock warrant under Wyo. Stat. Ann. § 35-7-1045(e) (Lexis Nexis 2017). According to Mr. Mathewson, these facts taken together demonstrate suppression of the evidence was warranted because the issuing judge wholly abandoned his detached and neutral judicial role.
[¶43] Wyo. Stat. Ann. § 35-7-1045(e) provides, in part:
(e) Any officer authorized to execute a search warrant relating to offenses involving controlled substances the penalty for which is imprisonment for more than one (1) year may, without notice of his authority and purpose, break open an outer or inner door or window of a building, or any part of the building, or anything therein, only if a district judge or district court commissioner issuing the warrant : (i) is satisfied that there is probable cause to believe that (A) the property sought may and, if such notice is given, will be easily and quickly destroyed or disposed of, or (B) the giving of such notice will immediately endanger the life or safety of the executing officer or another person; and (ii) has included in the warrant a direction that the officer executing it shall not be required to give such notice.
(Emphasis added.) We have already determined probable cause existed to issue the warrant. See supra , ¶¶ 19-36. The affidavit also describes circumstances satisfying the specific probable cause requirements of Wyo. Stat. Ann. § 35-7-1045(e). The affidavit provides details relating to Mr. Mathewson's involvement in the ongoing trafficking of methamphetamine and his possession of felony amounts of the controlled substance at his home. The affidavit further describes a sophisticated security system enabling Mr. Mathewson to destroy evidence, as officers suspected he did before, if notice of the search warrant were required. The circuit court judge signed the no-knock warrant as a district court commissioner. There is nothing whatsoever in the record to rebut the judge's authority as signatory on the warrant.
[¶44] Turning to Mr. Mathewson's bias and lack of impartiality claims, we recognize an application for a search warrant "must be reviewed with neutrality and detachment by a judicial officer" who is "independent of the police and prosecution." Guerra , 897 P.2d at 458 (citations omitted). Whether the issuing judicial officer was neutral and detached requires "an individualized *207 and contextual inquiry" focused on "the specific circumstances surrounding the issuance of the warrant." United States v. Ramirez , 63 F.3d 937, 941 (10th Cir. 1995). We do not assume the "issuing [judicial officer] has abandoned his neutral and detached role absent some evidentiary showing of such." Guerra , 897 P.2d at 458 (citation omitted).
[¶45] Mr. Mathewson relies on a complaint he filed against the issuing judge with the Wyoming Commission on Judicial Conduct and Ethics (Commission) in 2007 in support of his claim of bias and lack of impartiality. Although the Commission investigated the matter and ultimately concluded the judge did not violate any judicial cannons, the judge did implement certain unidentified corrective measures. Mr. Mathewson contends this demonstrates the judge was "in no way neutral or detached from Mr. Mathewson's case when he signed the search [warrant]."
[¶46] The district court rejected Mr. Mathewson's contention that the circuit court judge could not have acted in a fair and impartial manner because of a purported bias, explaining:
Other than the existence of letters relating to [a] complaint made by the Defendant against the issuing magistrate approximately nine years ago, which resulted in a dismissal of the complaint, there is a dearth of evidence of record to support Defendant's contention. More importantly, examination of the four corners of the affidavit causes this Court to conclude that it contains sufficient evidence to support issuance of the warrant. Emphasis is placed exclusively on the affidavit itself. Thereby rendering the alleged bias and history between the Defendant and issuing magistrate essentially irrelevant.
We agree with the district court. Once it is independently determined the affidavit establishes probable cause, and absent any evidence bias played a role in issuance of the warrant, there is no reason to question the issuing judge's impartiality. See, e.g. , United States v. Guthrie , 184 Fed.Appx 804, 808 (10th Cir. 2006) (citation omitted). Here, there is no evidence to suggest the circuit court judge based his decision to issue the warrant on anything other than the information presented in Lieutenant Pebbles' affidavit. Mr. Mathewson relies heavily on the judicial ethics complaint he filed against the judge, approximately nine years prior to issuance of the search warrant, to support his claim of bias. The prior ethics complaint is patently insufficient to demonstrate the judge's alleged bias toward Mr. Mathewson. See, e.g. , United States v. Houston , 965 F.Supp.2d 855, 873 (E.D. Tenn. 2013) ("[T]he mere fact that the defendant filed a lawsuit against a magistrate judge does not establish a personal bias by the judge."); United States v. Johnson , 78 F.3d 1258, 1263 (8th Cir. 1996) (magistrate judge determined to be neutral and detached despite evidence of defendant's dislike for the judicial officer due to prior contacts because the defendant failed to demonstrate prior contacts caused judicial officer to exhibit prejudice toward defendant). Absent any evidence to support the contention that the judge based his decision to issue the warrant on something other than the information presented in the affidavit, there is no reason to question the judge's impartiality and the district court did not err in denying Mr. Mathewson's motion to suppress.
II. Was Mr. Mathewson denied his right to a speedy trial?
[¶47] Mr. Mathewson asserts a violation of his right to a speedy trial under both Rule 48 of the Wyoming Rules of Criminal Procedure and the Sixth Amendment of the United States Constitution. We review claims of speedy trial violations de novo to ensure the mandates of W.R.Cr.P. 48 and constitutional guarantees are met. Berry v. State , 2004 WY 81, ¶ 17, 93 P.3d 222, 227 (Wyo. 2004) (citation omitted).
A. W.R.Cr.P. 48
[¶48] We analyze Mr. Mathewson's speedy trial rights under W.R.Cr.P. 48 by calculating the 180-day requirement, beginning with arraignment and ending with commencement of trial. Ortiz v. State , 2014 WY 60, ¶ 33, 326 P.3d 883, 892 (Wyo. 2014) (citation omitted). We exclude any of the following time periods, as permitted under the Rule:
*208 (A) All proceedings related to the mental illness or deficiency of the defendant;
(B) Proceedings on another charge;
(C) The time between the dismissal and the refiling of the same charge; and
(D) Delay occasioned by defendant's change of counsel or application therefor.
W.R.Cr.P. 48(b)(3). In addition, the "[f]iling [of] a signed waiver of speedy trial by the defendant effectively stops the clock pursuant to W.R.Cr.P. 48." Ortiz , ¶ 35, 326 P.3d at 892 (citation omitted). Rule 48 also permits continuances exceeding 180 days from the date of arraignment as follows:
(A) On motion of defendant supported by affidavit; or
(B) On motion of the attorney for the state or the court if:
(i) The defendant expressly consents;
(ii) The state's evidence is unavailable and the prosecution has exercised due diligence; or
(iii) Required in the due administration of justice and the defendant will not be substantially prejudiced; and
(C) If a continuance is proposed by the state or the court, the defendant shall be notified. If the defendant objects, the defendant must show in writing how the delay may prejudice the defense.
W.R.Cr.P. 48(b)(4). "Any criminal case not tried or continued as provided in this rule shall be dismissed 180 days after arraignment." W.R.Cr.P. 48(b)(5).
[¶49] Mr. Mathewson's arraignment occurred on September 14, 2015, and the district court set a February 1, 2016, trial date-140 days after his arraignment and within the 180-day deadline. The trial setting was then delayed five times, but trial eventually commenced on January 23, 2017-a total of 497 days after his arraignment, and well beyond the 180-day deadline. Accordingly, we determine if any time periods may be properly excluded from the calculation pursuant to W.R.Cr.P. 48(b)(3) or (b)(4).
[¶50] Mr. Mathewson concedes 20 days (October 9, 2015, to October 29, 2015) are excludable due to a change in defense counsel.[10] W.R.Cr.P. 48(b)(3)(D) ; Berry , ¶¶ 26, 29, 93 P.3d at 229-30 (excluding time prior to the original trial date). He also acknowledges we may exclude the time period covered by his speedy trial waiver until the date he filed his speedy trial demand (which Mr. Mathewson calculates as 172 days); however, Mr. Mathewson contends all other time periods must be included. As a result, Mr. Mathewson asserts 237 days elapsed between his arraignment and the commencement of trial, clearly exceeding the 180-day deadline, and violating his right to a speedy trial. We disagree with Mr. Mathewson's calculations and determine additional time periods are also properly excluded under the Rule.
[¶51] As noted above, the district court scheduled the original trial date 140 days after Mr. Mathewson's arraignment. During the pretrial conference, the district court announced that a scheduling conflict required vacating the trial date, which it later rescheduled for February 25, 2016. Because the district court vacated the trial date without notifying Mr. Mathewson and providing him an opportunity to object as required by W.R.Cr.P. 48(b)(4)(C), the delay from February 1, 2016, to February 25, 2016, (24 days) cannot be excluded.
[¶52] Next, on February 9, 2016, Mr. Mathewson's counsel moved for a continuance and filed a speedy trial waiver. The district court granted the motion and reset the trial for May 31, 2016. Due to Mr. Mathewson's waiver of speedy trial, we exclude the delay from February 25, 2016, to May 31, 2016 (96 days). W.R.Cr.P. 48(b)(4)(A) ; Ortiz , ¶ 35, 326 P.3d at 892.
[¶53] Mr. Mathewson's counsel requested another continuance, which Mr. Mathewson favored, during the time Mr. Mathewson's speedy trial waiver was in effect. The district court reset the trial for October 31, 2016. Prior to the trial date, Mr. Mathewson *209 filed a pro se demand for speedy trial. Nonetheless, in light of Mr. Mathewson's express consent to the continuance and the fact the court set the October 31, 2016, trial date during the time he waived his right to a speedy trial, we may exclude the time between May 31, 2016, and October 31, 2016 (153 days). W.R.Cr.P. 48(b)(4)(B)(i), (iii) ; Ortiz , ¶ 35, 326 P.3d at 892.
[¶54] During the pretrial conference on October 3, 2016, Mr. Mathewson's counsel informed the court of a potential conflict possibly requiring a new judge. The district court advised Mr. Mathewson that assigning a new judge would delay the trial and, in light of his pro se speedy trial demand, he would need to decide whether he desired reassignment of the case. On October 10, 2016, Mr. Mathewson's counsel filed a motion for change of judge. The district court granted the motion and vacated the trial date the following day. Mr. Mathewson did not object to the delay, nor did he articulate any prejudice. After reassignment, the district court set tentative stacked trial dates on January 9, 2017, and February 6, 2017. Thus, the time between October 31, 2016, and the first tentative trial date of January 9, 2017, is also properly excluded (70 days). W.R.Cr.P. 48(b)(4)(B)(iii), (C) ; McDaniel v. State , 945 P.2d 1186, 1188 (Wyo. 1997) (holding delay due to defendant's request for a new judge was properly excluded under Rule 48(b)(4)(B)(iii) ).
[¶55] Thereafter, the district court learned of an opening in its docket that did not require a stacked setting and fell within the original January/February timeframe previously reserved for Mr. Mathewson's trial. The district court advised the parties of this new date during the November 21, 2016, suppression hearing and issued an order the next day. Although it is difficult to see how the new trial setting might have prejudiced Mr. Mathewson, we cannot properly exclude the dates between January 9, 2017, and January 23, 2017, the first day of trial (14 days), because the district court set the new trial date without notifying Mr. Mathewson and providing him an opportunity to object as required by W.R.Cr.P. 48(b)(4)(C),
[¶56] Summarizing the foregoing time periods, the district court set the original trial date 140 days after Mr. Mathewson's arraignment and within the 180-day deadline. We must add the delays attributable to the district court's docketing issues-February 1, 2016, to February 25, 2016 (24 days) and January 9, 2017, and January 23, 2017 (14 days)-an additional 38-day delay. All other delays in bringing Mr. Mathewson to trial are excluded from the 180-day calculation for the reasons stated above. Thus, we conclude Mr. Mathewson's trial commenced within the time specified by Rule 48 (497 - 319 = 178 days) and Mr. Mathewson's speedy trial rights under the Wyoming Rules of Criminal Procedure were not violated.[11]
B. Constitutional Right to Speedy Trial
[¶57] We next evaluate Mr. Mathewson's claim his constitutional right to a speedy trial was violated under the four-factor test set forth in Barker v. Wingo , 407 U.S. 514, 530-33, 92 S.Ct. 2182, 2192-93, 33 L.Ed.2d 101 (1972) : "(1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) the prejudice to the defendant." Ortiz , ¶ 39, 326 P.3d at 893 (citations omitted). We conduct this analysis to determine "whether the delay in bringing the accused to trial was unreasonable, that is, whether it substantially impaired the right of the accused to a fair trial." Id. (citation omitted). No single factor is dispositive. Id. (citation omitted). Instead, we consider the factors "together and balanced in relation to all relevant circumstances." Berry , ¶ 31, 93 P.3d at 231 (citation omitted). The State has the burden to prove delays in bringing the defendant to trial are reasonable and necessary. Id. (citation omitted).
*210 i. Length of Delay
[¶58] "Unlike our analysis under Rule 48, the [constitutional] speedy trial clock begins to run at the time of arrest, information, or indictment, whichever occurs first." Webb v. State , 2017 WY 108, ¶ 15, 401 P.3d 914, 921 (Wyo. 2017) (internal quotation marks and citations omitted). "The right to a speedy trial continues until the defendant is convicted, acquitted or a formal entry is made on the record of his case that he is no longer under indictment." Ortiz , ¶ 40, 326 P.3d at 893 (internal quotation marks and citations omitted). Mr. Mathewson's arrest occurred on May 3, 2015, and he was convicted on January 26, 2017, resulting in a 634-day delay. Although "[n]o precise length of delay automatically constitutes a violation of the right to a speedy trial," a delay of over 365 days presumptively triggers review of the remaining Barker factors. Berry , ¶ 32, 93 P.3d at 231 ; Webb , ¶ 16, 401 P.3d at 922 ; Tate v. State , 2016 WY 102, ¶ 28, 382 P.3d 762, 768 (Wyo. 2016) (and cases cited therein).
ii. Reason for Delay
[¶59] Under the second Barker factor, which requires consideration of the reasons for the delay in bringing Mr. Mathewson to trial, we examine which party was responsible for the delay. Ortiz , ¶ 42, 326 P.3d at 893 (citation omitted). "We weigh the delays caused by the State against those caused by the defendant, keeping in mind it is the State's burden to bring a defendant to trial in a timely manner and it must show that the delays were reasonable and necessary." Durkee v. State , 2015 WY 123, ¶ 16, 357 P.3d 1106, 1112 (Wyo. 2015) (citation omitted). "[C]ircumstances such as overcrowded courts and their schedules are more neutral reasons for delay, and should not be weighed as heavily against the State." Webb , ¶ 17, 401 P.3d at 922 (citation omitted). Delays attributable to the defendant, including requests for continuances, changes in defense counsel, and defendant's pretrial motions, "may disentitle a defendant to speedy trial safeguards." Id. (citation omitted). Any delay caused by the defendant's counsel is also charged against the defendant. Castellanos v. State , 2016 WY 11, ¶ 73, 366 P.3d 1279, 1300 (Wyo. 2016).
[¶60] Mr. Mathewson acknowledges he caused some of the delays in his case, but contends the majority of those delays occurred after he executed a speedy trial waiver and the "speedy trial clock was already stopped," and surmises, without citation to authority, that those delays are not attributable to him. Mr. Mathewson further asserts that although he requested a continuance of the May trial date in early April, "there was no action on behalf of the court or the state to get the jury trial date reset" until November 14, 2016, which he calculates as a 224-day delay.[12] He also claims the trial date was continually pushed back, reset, vacated, and reset again, without any "clear reason as to why the jury trial was continued again, and again, and again." The record does not support Mr. Mathewson's assertions.
[¶61] The record reveals that most of the delays resulted from Mr. Mathewson's actions. His ongoing disputes with his court-appointed attorneys necessitated repeated rescheduling of various conferences, hearings, and trial dates. Mr. Mathewson refused his first court-appointed counsel, resulting in a delay of his preliminary hearing. The court rescheduled the preliminary hearing two additional times due to defense counsel's scheduling conflicts. Similarly, Mr. Mathewson's arraignment required rescheduling because his counsel failed to appear. Mr. Mathewson also requested a continuance of the February 25, 2016, trial date, and the next trial date of May 31, 2016. Just weeks prior to the October 31, 2016, trial date, Mr. Mathewson requested reassignment of the judge after being advised any reassignment would further delay his trial.
[¶62] In contrast, the State did not directly contribute to any delay in this case. The only delays we attribute to the State are those caused by the district court's docket; i.e., *211 postponement of Mr. Mathewson's original trial date of February 1, 2016, to February 25, 2016, and resetting the alternative stacked trial dates of January 9, 2017, and February 6, 2017, to January 23, 2017. Although these delays are attributable to the State, they do not weigh heavily in the analysis. See, e.g. , Webb , ¶ 17, 401 P.3d at 922 (citation omitted). Instead, the majority of the delay is attributable to Mr. Mathewson and necessarily weighs against him in his speedy trial claim.
iii. Defendant's Assertion of His Right to Speedy Trial
[¶63] We next consider whether Mr. Mathewson asserted his right to a speedy trial. "Although a defendant is not required to assert his right to a speedy trial, the vigor with which the defendant asserted his right is an important consideration in determining the reasonableness of any delay." Griggs v. State , 2016 WY 16, ¶ 68, 367 P.3d 1108, 1130 (Wyo. 2016) ; see also , Ortiz , ¶ 52, 326 P.3d at 895 (citations omitted) ("The failure to assert the right to a speedy trial, while not necessary to prove a violation of that right, weighs heavily in determining whether that right was violated."). A defendant's consistent assertion of his right weighs heavily in favor of the defendant, whereas less than vigorous assertions are given little weight. Berry , ¶ 45, 93 P.3d at 236 ; Campbell v. State , 999 P.2d 649, 656 (Wyo. 2000) (citation omitted).
[¶64] The record reflects Mr. Mathewson asserted his right to a speedy trial by filing a pro se demand for speedy trial on August 4, 2016, and several motions to dismiss for speedy trial violations, most of which were filed pro se. Notably, however, Mr. Mathewson took inconsistent positions concerning his speedy trial rights throughout the entirety of the proceedings. For example, Mr. Mathewson filed a motion to dismiss for a speedy trial violation related to his delayed preliminary hearing many months after he waived a speedy preliminary hearing and requested a continuance of that proceeding. Mr. Mathewson also executed a speedy trial waiver in February 2016 and requested and caused continuances thereafter. Although the speedy trial waiver does not permit an unlimited delay in the defendant's trial, "when the defendant has waived his speedy trial right, and then proceeds to cause numerous delays, those facts weigh substantially in favor of the State." Ortiz , ¶ 54, 326 P.3d at 895 (citation omitted). Following his later demand for speedy trial on August 4, 2016, Mr. Mathewson requested reassignment of the judge, causing further delay. Taking Mr. Mathewson's inconsistent positions into account, we conclude his assertions were less than vigorous and we give this factor little weight in the overall speedy trial analysis. Webb , ¶ 22, 401 P.3d at 923 (citations omitted).
iv. Prejudice to Defendant
[¶65] The final Barker factor requires that we consider whether the delay prejudiced Mr. Mathewson. To evaluate prejudice, we consider, "(1) lengthy pretrial incarceration; (2) pretrial anxiety; and, (3) impairment of the defense." Ortiz , ¶ 59, 326 P.3d at 896 (quoting Berry , ¶ 46, 93 P.3d at 237 ). "Pretrial anxiety 'is the least significant' factor and because a 'certain amount of pretrial anxiety naturally exists,' an appellant must demonstrate that he suffered 'extraordinary or unusual' pretrial anxiety." Webb , ¶ 23, 401 P.3d at 923-24 (quoting Castellanos , ¶ 88, 366 P.3d at 1303 ). We consider "[t]he impairment of defense factor" as the "most serious because it impacts the defendant's ability to prepare his case and skews the fairness of the entire system." Id . Where, as here, the defendant claims prejudice, he has the burden to demonstrate and substantiate such prejudice. Id. (citations omitted). "If the defendant fails to demonstrate prejudice, the other three Barker factors must weigh heavily in his favor to establish a speedy trial violation." Id . (citation omitted) (emphasis added).
[¶66] Mr. Mathewson claims he suffered prejudice under two of the three factors. First, Mr. Mathewson claims he greatly suffered pretrial anxiety because, although he was released on bond, he constantly worried about the outcome of trial and the impact his trial may have on his family in light of his significant other's terminal illness. While we recognize Mr. Mathewson suffered *212 some pretrial anxiety inherent to pending criminal proceedings, our precedent requires a showing of special harm suffered. Tate , ¶ 41, 382 P.3d at 771 (citation omitted). Mr. Mathewson's self-expression of the anxiety he suffered while released on bond is insufficient to establish the extraordinary or unusual pretrial anxiety required to show prejudice. See id. (citations omitted); Webb , ¶ 24, 401 P.3d at 924 (citation omitted) (defendant's "blanket statement that he lost his liberty, home, relationship with his children, missed his daughter's wedding, suffered financial harm, was unable to adequately respond to divorce and child support proceedings, and suffered degradation and anxiety," was insufficient to establish extraordinary or unusual pretrial anxiety).
[¶67] Second, Mr. Mathewson contends his defense was impaired due to multiple judges and changes in his defense counsel, explaining his final court-appointed attorney "had to make sense of the mess that was Mr. Mathewson's criminal file, including the lapses in time, the continuances of hearings and trials[.]" This statement is wholly insufficient to demonstrate an impaired defense. As previously noted, most of the changes in counsel and the change of the judge came at Mr. Mathewson's own hand. Moreover, he offers no argument that the delay of trial resulted in a loss of evidence or otherwise impaired the defense by "death, disappearance, or memory loss of [a witness]," as our precedent requires. Castellanos , ¶ 90, 366 P.3d at 1303 (quoting Ortiz , ¶ 62, 326 P.3d at 896 ). Absent such showing, we cannot conclude the delay impaired Mr. Mathewson's defense. See id. Mr. Mathewson cannot prevail on any of the three prejudice prongs. Thus, the fourth and final Barker factor weighs heavily against him.
v. Balancing of the Factors
[¶68] Though the 634-day delay between Mr. Mathewson's arrest and conviction weighs in his favor, the remaining factors do not. The majority of delays were primarily attributable to Mr. Mathewson, which weighs heavily against him. And, his inconsistent, less than vigorous assertions of his speedy trial right are given little weight in the overall analysis. Therefore, on balance, we cannot say the delay in bringing Mr. Mathewson to trial was unreasonable under the circumstances of this case. See Ortiz , ¶ 39, 326 P.3d at 893. We conclude Mr. Mathewson was not denied his constitutional right to a speedy trial.
III. Does sufficient evidence support Mr. Mathewson's conviction of felony possession of methamphetamine in a liquid form as contemplated by Wyo. Stat. Ann. § 35-7-1031 ?
[¶69] Mr. Mathewson questions the sufficiency of the evidence supporting his conviction of felony possession of methamphetamine in a liquid form.[13] He contends the methamphetamine detected in his bong water is not methamphetamine in a "liquid form," as contemplated and required by Wyo. Stat. Ann. § 35-7-1031(c)(i)-(ii). Rather, it is methamphetamine in a crystalline form "that is only ending up in a liquid after being used."
[¶70] Mr. Mathewson also requests that we reconsider our holding in Smith v. State , 964 P.2d 421 (Wyo. 1998). Although he acknowledges Smith permits including the weight of the bong water in calculating the weight of the controlled substance for purposes of determining a misdemeanor or felony offense, he contends the holding does not comport with legislative intent and produces an absurd result. According to Mr. Mathewson, the legislature intended that only pure liquid methamphetamine would constitute a felony under Wyo. Stat. Ann. § 35-7-1031(c)(ii), (d) -not the unusable byproduct found in bong water. He argues the small amount of *213 methamphetamine in a liquid form (3/10 of a gram) required to constitute a felony compared with the larger amount of methamphetamine in a crystalline or powder form (3 grams) required to constitute felony possession, signals the legislature's intent that "liquid form" means "liquid methamphetamine" because that drug is much more potent and dangerous.
[¶71] To determine whether sufficient trial evidence exists to sustain a jury's conviction, "we examine and accept as true the State's evidence and all reasonable inferences which can be drawn from it. We do not consider conflicting evidence presented by the defendant." Anderson v. State , 2009 WY 119, ¶ 6, 216 P.3d 1143, 1145 (Wyo. 2009) (citations omitted). "When applying this standard, we do not reweigh the evidence or re-examine the credibility of the witnesses." Foltz , ¶ 10, 407 P.3d at 401-02 (citation omitted). We simply determine "whether or not the evidence could reasonably support such a finding by the factfinder." Id . (citation omitted). "This standard applies whether the evidence supporting the conviction is direct or circumstantial." Id. (citation omitted).
[¶72] This issue also requires that we interpret Wyo. Stat. Ann. § 35-7-1031. "Statutory interpretation is a question of law which we review de novo. " Sam v. State , 2017 WY 98, ¶ 14, 401 P.3d 834, 844 (Wyo. 2017), reh'g denied (Sept. 26, 2017), cert. denied , --- U.S. ----, 138 S.Ct. 1988, 201 L.Ed.2d 248 (2018) (citation omitted). Our primary objective in interpreting statutes is to give effect to the legislature's intent "as reflected in the plain and ordinary meaning of the words used in the statute." Butler v. State , 2015 WY 119, ¶ 7, 358 P.3d 1259, 1262 (Wyo. 2015) (citation omitted). We "construe each statutory provision in pari materia , giving effect to every word, clause, and sentence according to their arrangement and connection." Marfil v. State , 2016 WY 12, ¶ 19, 366 P.3d 969, 974 (Wyo. 2016) (citation omitted). If a term used in a criminal statute is not given a statutory definition, we conclude the legislature did not intend to give the term a specialized meaning. Id. , ¶ 19, 366 P.3d at 974-73 (citations omitted). Further, "[w]hen this Court interprets a statute and the legislature makes no material legislative change in the provision thereafter, the legislature is presumed to acquiesce in the Court's interpretation." Id. , ¶ 23, 366 P.3d at 975 (citations omitted).
A. Wyo. Stat. Ann. § 35-7-1031(c) - "Liquid Form"
[¶73] Under Wyoming law, whether the possession of methamphetamine constitutes a misdemeanor or felony offense depends on the weight and form of the controlled substance. Wyo. Stat. Ann. § 35-7-1031(c) ; Daley v. State , 2016 WY 22, ¶ 12, 368 P.3d 291, 293 (Wyo. 2016). Mr. Mathewson was charged with and convicted of felony possession of methamphetamine in a liquid form exceeding three-tenths (3/10) of a gram pursuant to Wyo. Stat. Ann. § 35-7-1031(c), which provides in pertinent part:
(c) It is unlawful for any person knowingly or intentionally to possess a controlled substance unless the substance was obtained directly from, or pursuant to a valid prescription or order of a practitioner while acting in the course of his professional practice, or except as otherwise authorized by this act. ... Any person who violates this subsection:
(i) And has in his possession a controlled substance in the amount set forth in this paragraph is guilty of a misdemeanor ....
(A) For a controlled substance in plant form, no more than three (3) ounces;
(B) For a controlled substance in liquid form, no more than three-tenths ([3]/10) of a gram ;
(C) For a controlled substance in powder or crystalline form, no more than three (3) grams;
(D) For a controlled substance in pill or capsule form, no more than three (3) grams;
....
(ii) And has in his possession methamphetamine or a controlled substance classified in Schedule I or II which is a narcotic drug in an amount greater than those set forth in paragraph *214 (c)(i) of this section, is guilty of a felony ....
....
(d) For purposes of determining the weights to be given the controlled substances under this section, the weights designated in this section shall include the weight of the controlled substance and the weight of any carrier element, cutting agent, diluting agent or any other substance excluding packaging material .
Wyo. Stat. Ann. § 35-7-1031 (emphasis added). To constitute felony possession, the statute requires the methamphetamine to be in "liquid form" in an amount exceeding three-tenths (3/10) of a gram as distinguished from the other forms listed in the statute, namely "plant form," "powder or crystalline form," and "pill or capsule form." Wyo. Stat. Ann. § 35-7-1031(c)(i)(A)-(D). The legislature did not give the phrase "liquid form" any specialized meaning, consequently we employ the plain meaning of those terms. "Liquid" is defined as "flowing freely like water," or "having the properties of a liquid: being neither solid nor gaseous." Merriam-Webster, https://www.merriam-webster.com/dictionary/liquid (last visited Mar. 20, 2019). "Form" is defined as "the shape and structure of something as distinguished from its material." Merriam-Webster, https://www.merriam-webster.com/dictionary/form (last visited Mar. 20, 2019).
[¶74] Mr. Mathewson essentially argues "liquid form" means "liquid methamphetamine" and does not include methamphetamine dissolved in water. In order to accept Mr. Mathewson's argument, we would have to rewrite Wyo. Stat. Ann. § 35-7-1031(c)(i)(B), and omit the word "form" altogether. Methamphetamine in "liquid form" includes "liquid methamphetamine," and, thus, the statute is not as restrictive as Mr. Mathewson argues. We cannot and will not rewrite the statute to restrict the broader scope intended by the legislature. See, e.g. , Triangle Cross Ranch, Inc. v. State, Wyo. Dep't of Family Servs. , 2015 WY 47, ¶ 18, 345 P.3d 890, 894 (Wyo. 2015) (citation omitted) (explaining we "cannot, under the guise of its powers of construction, rewrite a statute, supply omissions, or make other changes").
[¶75] Giving Wyo. Stat. Ann. § 35-7-1031(c) its plain and ordinary meaning, the State was required to prove the methamphetamine found in Mr. Mathewson's water pipe was "flowing freely like water" and was not in a solid or a gas form. During trial, the State called Sarah Barrett, a forensic chemist with the Wyoming State Crime Lab, who explained that the liquid taken from Mr. Mathewson's water pipe tested positive for the presence of methamphetamine. On cross-examination, Ms. Barrett further testified:
Q Okay. Now I want to turn your attention to item -- lab item six, and that is the plastic bottle that contains the purple opaque liquid. And when you weighed that liquid, you weighed it to be 26.06 grams; is that correct?
A 26.061 grams, yes.
Q Okay, Now, that was the amount of -- that was the weight of the liquid in the bottle; is that correct?
A That was the weight of the liquid, not including the bottle.
Q Okay. Now, in that liquid you identified the presence of methamphetamine and amphetamine, correct?
A Yes.
* * *
[Q] Now, is it also safe to say that when you identified the presence of methamphetamine in that liquid, do you know what that liquid was? Was it water, H20?
[A] I didn't do any testing to determine what the liquid was.
* * *
Q Right. In the world of chemistry there are liquids and solids and gases; is that correct?
A Yes.
Q Okay. And sometimes a solid is suspended in a liquid, correct, as a soluble solution?
A Yes.
Q For example, salt water.
A Yes.
*215 Q Okay. And salt water, salt water is not liquid salt, correct? It's solid salt suspended in liquid --
A No.
Q -- dissolved in water?
A A solid dissolved in a liquid.
Q Okay. And that is possibly what was going on here?
A Yes.
Q Okay. And it was solid methamphetamine dissolved in a liquid; water, for example?
A That's possible.
Q Okay. And if that were the case, you don't know exactly how much that solid was, correct?
A That's correct.
Q In fact, it could be that it was 26.061 -- or let's say 26.06 grams of water and point one gram of solid methamphetamine suspended in that water?
* * *
[A] It could be a very small amount of meth, I don't know.
[Q] Okay. A very small amount of meth in solid form, suspended in liquid, correct?
[A] Dissolved in liquid.
On redirect examination, the State further inquired into the methamphetamine being dissolved in the liquid:
[Q] [W]hat are the forms of testing that you do for Wyoming agencies for criminal cases, as to the forms of meth? What forms of meth do you test?
A I test for solids and liquids.
Q Okay. And what is your method of differentiating between what is a solid and what is a liquid when you're testing meth?
A If I can pour it into a graduated cylinder, then I define that as a liquid.
Q So under your laboratory testing procedure, if it's pourable, it's liquid, and it's meth if it tests positive for meth, would that be correct?
A Yes.
Trial evidence therefore established that the Wyoming State Crime Lab tested a pourable liquid obtained from Mr. Mathewson's water pipe. That pourable liquid tested positive for methamphetamine. Consequently, the evidence supports the jury's finding that Mr. Mathewson possessed methamphetamine in a "liquid form" under the plain language of Wyo. Stat. Ann. § 35-7-1031(c)(i)(B).
B. Wyo. Stat. Ann. § 35-7-1031(d) -Smith
[¶76] Mr. Mathewson agrees that under our holding in Smith , the State properly included the bong water for the weight calculation, but argues we should overturn Smith because it defies logic and produces an absurd result. Mr. Mathewson contends that liquid methamphetamine is a "newer and very transportable form" of the drug being used for smuggling methamphetamine into the country, whereas bong water has no such purpose-i.e., it is not used for transportation of methamphetamine or for consumption.[14] Specifically, Mr. Mathewson argues the bong water is not being used as a "cutting, carrying, or diluting agent," but rather is a byproduct, and does not fall under the purview of Wyo. Stat. Ann. § 35-7-1031(d).
[¶77] In Smith , we held that Section 35-7-1031(d) was not unconstitutionally vague and stated:
Smith's contention ignores the last portion of the statute which states "or any other substance excluding packaging material" which is plainly sufficiently broad to encompass the weight of water containing methamphetamine found in his possession. The statute is clear that the weight of any other substance containing a quantity of an illegal drug should be added to the weight of a controlled substance to raise the crime of possession from a misdemeanor to a felony . The legislature has virtually unlimited power to determine what conduct shall be a crime and, so long *216 as that determination is constitutional, the legislature decides whether or not a criminal statute should sweep narrowly or broadly .
Smith , 964 P.2d at 423 (emphasis added) (citations omitted).
[¶78] Like the appellant in Smith , Mr. Mathewson ignores the "any other substance" language used in the statute, which, as we held in Smith , is sufficiently broad to encompass the weight of water containing methamphetamine. Id . If the legislature believed we misinterpreted the statute in Smith , it has had ample time to amend the statute.[15] See Marfil , ¶ 23, 366 P.3d at 975 (citation omitted).
[¶79] Mr. Mathewson has not justified why our plain language interpretation of Wyo. Stat. Ann. § 35-7-1031(d) should change. Although he argues the methamphetamine contained in the bong water is an unusable byproduct not contemplated by the statute, subsection (d) does not limit or otherwise require the phrase "other substance" to include only usable, consumable, or marketable substances, or to exclude waste products. See, e.g. , Lo Sasso v. Braun , 386 P.2d 630, 631 (Wyo. 1963) (stating "the general rule that courts cannot supply omissions in a statute and will not read into a statute exceptions not made by the legislature"). Nor has Mr. Mathewson directed us to any applicable precedent wherein we required the State to prove the defendant possessed a useable form of methamphetamine in a felony amount. We therefore decline to overturn our holding in Smith , and, instead, conclude sufficient evidence supports Mr. Mathewson's conviction for felony possession of methamphetamine.
CONCLUSION
[¶80] The district court properly denied Mr. Mathewson's motion to suppress because probable cause existed to issue the no-knock warrant and a district court commissioner issued the warrant as required by Wyo. Stat. Ann. § 35-7-1045(e). Applying Rodriguez , we conclude Mr. Mathewson's claim the probable cause affidavit contained false information is waived pursuant to W.R.Cr.P. 12(g). We also conclude Mr. Mathewson was not denied his right to a speedy trial under W.R.Cr.P. 48 or the United States Constitution. Further, we conclude sufficient evidence supports Mr. Mathewson's conviction of felony possession of methamphetamine and our holding in Smith remains sound. Affirmed.

Mr. Mathewson's pro se motion also requested joinder of all offenses arising out of the search of his home on May 1, 2015, stating he "should not be forced to 3 trials for the same incident."

After the district court denied the motion to dismiss, Mr. Mathewson filed a pro se appeal, which we dismissed as untimely and because the order was not a final appealable order.

In addition to those misdemeanor charges stemming from Mr. Mathewson's May 3, 2015, arrest, he faced charges in three other circuit court cases: (1) Misdemeanor charge for a positive drug test after his May 3, 2015, arrest; (2) Misdemeanor charge for trespassing occurring on September 6, 2015; and (3) Misdemeanor charge for driving with a suspended license on December 14, 2015.

The district court struck the pro se documents for running afoul of W.R.C.P. 11, which requires the attorney of record to sign "[e]very pleading, written motion and other paper." W.R.C.P. 11 is applicable to criminal cases via W.R.Cr.P. 49(d).

The district court imposed the following sentences:
• Count I, Possession of a Controlled Substance, Methamphetamine , 2-3 years of incarceration, with credit for time served, suspended pending two years of supervised probation;
• Count III, Possession of a Controlled Substance, Methamphetamine , 30 days of incarceration with credit for time served;
• Count V, Possession of a Controlled Substance, Marijuana , 30 days of incarceration with credit for time served;
• Count VI, Use of Methamphetamine , 30 days of incarceration with credit for time served;
• Count VII, Trespassing , 30 days of incarceration, suspended pending six months supervised probation; and
• Count VIII, Driving While License is Suspended, 10 days of incarceration, suspended pending six months of supervised probation.
The court awarded 13 days credit against the minimum/maximum sentences on Counts I-VI, and ordered the sentences to run concurrently. The court also ordered Counts VII and VIII to run concurrent with each other, but consecutive to Counts I-VI. In addition, the court-imposed costs, fees, and fines, and ordered Mr. Mathewson to complete an intensive out-patient treatment program.

Our opinion in Rohda v. State , 2006 WY 120, ¶¶ 5-9, 142 P.3d 1155, 1158-60 (Wyo. 2006), as amended (Mar. 25, 2008), suggests that probable cause standards are the same under the Wyoming and United States constitutions; we do not opine on that issue here.

The specific, additional requirements for a no-knock warrant are discussed infra at ¶ 43.

Lieutenant Pebbles' probable cause affidavit references a fourth confidential informant, CI 15-5. This informant refused to provide Lieutenant Pebbles with information about the Thermopolis drug trade on multiple occasions. However, in a conversation occurring between March 25, 2015, and April 20, 2015, CI 15-5 named "Paul Mathewson" and told Lieutenant Pebbles his name should be enough to "cure the drug problem in Thermopolis and Hot Springs County at least for a while." No other details were provided. We recognize this unverified statement is a bare conclusion, which lacks proper factual foundation. See, e.g. , Abeyta v. State , 2007 WY 142, ¶ 16, 167 P.3d 1, 8 (Wyo. 2007). However, under the totality of the circumstances approach, a bare conclusion contained in the affidavit does not defeat probable cause if supported by the other facts in the affidavit. Bonsness , 672 P.2d at 1293 (citation omitted). We must "examine the entire affidavit and determine whether, based on all the information contained therein, the warrant-issuing officer had a substantial basis for concluding that probable cause existed." Abeyta , ¶ 16, 167 P.3d at 8.

We acknowledge the State did not argue that Mr. Mathewson waived any claim that the probable cause affidavit contained false information under W.R.Cr.P. 12, and, therefore, arguably waived the issue of Mr. Mathewson's waiver. However, because Mr. Mathewson's pre-trial failure to allege that the probable cause affidavit contained false information impeded the development of the record on this key factual issue, we conclude the relative harm Mr. Mathewson caused is greater than the relative harm the State caused by failing to argue waiver. We therefore exercise our discretion to address the Rule 12 waiver issue sua sponte. See United States v. Elliott , 684 Fed.Appx. 685, 688 (10th Cir. 2017).

Mr. Mathewson concedes another 63 days (June 27, 2016, to August 29, 2016) are excludable due to another change in counsel. We note, however, this change in counsel occurred during the time Mr. Mathewson had waived his right to a speedy trial, and thus is not separately included in the calculation.

Because we conclude Mr. Mathewson was brought to trial within the 180-day deadline, we need not determine if additional time periods may be properly excluded due to changes in defense counsel in October 2015 and June 2016, and/or Mr. Mathewson's request for new counsel in January 2017.

Mr. Mathewson misrepresents the record by inexplicably overlooking the State's April 29, 2016, request for a scheduling conference to reset the trial date in light of Mr. Mathewson's request for continuance. The district court set the conference for June 2, 2016, and issued a scheduling order on June 29, 2016, which set a new trial date of October 31, 2016.

The State reframes Mr. Mathewson's issue as one arising from the denial of his motion for judgment of acquittal. We previously observed that "[a]s a practical matter, the standard of review for denial of a motion for judgment of acquittal is the same as that used when an appeal claims insufficient evidence to convict" because in both instances, the appellant "challenge[s] the sufficiency of the evidence." Foltz v. State , 2017 WY 155, ¶ 10, 407 P.3d 398, 401 (Wyo. 2017). Accordingly, we do not separately determine whether Mr. Mathewson's claim includes a challenge to the denial of his motion for judgment of acquittal and, instead, focus on whether sufficient evidence supports Mr. Mathewson's conviction.

If, as Mr. Mathewson contends, liquid methamphetamine is a newer drug, the legislature could not have intended the phrase "liquid form" set forth in Wyo. Stat. Ann. § 35-7-1031(c)(i)(B) to mean "liquid methamphetamine" because the phrase "liquid form" was added to the statute in 1995 and has not been subsequently amended. 1995 Wyo. Sess. Laws ch. 61. As the statute is currently worded, "liquid methamphetamine" would fall within the broader phrase "liquid form."

In State v. Peck , 773 N.W.2d 768, 773 (Minn. 2009) (partially overruled by statute as to the weight required to constitute felony possession), the appellate court determined that its statutory scheme permitted inclusion of bong water in calculating the amount of methamphetamine. Thereafter, the Minnesota legislature amended its statutory definitions to exclude the weight of fluid in a water pipe in computing the weight of a mixture unless it contained "four or more fluid ounces of fluid." State v. Drown , No. A14-0359, 2015 WL 1280868, at *2 (Minn. Ct. App. Mar. 23, 2015) (citing Act of May 24, 2011, ch. 53, §§ 6-8, 2011 Minn. Laws 202, 206-07 (codified at Minn. Stat. §§ 152.021, subd. 2(b), 152.022, subd. 2(b), 152.023, subd. 2(b) ) ). The Wyoming legislature could make similar statutory adjustments if it were so inclined.